# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date:  June 30, 2016**

**NO.  S-1-SC-35426**

**NOE RODRIGUEZ,**

   Worker-Respondent,

v.

**BRAND WEST DAIRY, Uninsured Employer,**

   Employer-Respondent,

**and**

**NEW MEXICO UNINSURED EMPLOYERS' FUND,**

   Insurer-Petitioner,

**Consolidated With:**

**MARIA ANGELICA AGUIRRE,**

   Worker-Respondent,

v.

**M.A. & SONS CHILI PRODUCTS,**

    Employer-Respondent,

**and**

**FOOD INDUSTRY SELF INSURANCE FUND OF NEW MEXICO,**

     Insurer-Respondent.

**And**

**NO. S-1-SC-35438**

**NOE RODRIGUEZ,**

     Worker-Respondent,

v.

**BRAND WEST DAIRY, Uninsured Employer,**

     Employer-Petitioner,

**and**

**NEW MEXICO UNINSURED EMPLOYERS' FUND,**

     Insurer,

**Consolidated With:**

**MARIA ANGELICA AGUIRRE,**

     Worker-Respondent,

v.

**M.A. & SONS CHILI PRODUCTS,**

     Employer-Petitioner,

**and**

**FOOD INDUSTRY SELF INSURANCE
FUND OF NEW MEXICO,**

Insurer-Petitioner.

**ORIGINAL PROCEEDINGS ON CERTIORARI
Victor S. Lopez and David L. Skinner, Workers' Compensation Judge**s

Hector H. Balderas, Attorney General
Richard P. Bustamante, Special Assistant Attorney General
Santa Fe, NM

for Insurer-Petitioner New Mexico Uninsured Employers' Fund

Maestas & Suggett, P.C.
Paul Maestas
Albuquerque, NM

for Employer-Respondents and Employer-Petitioners Brand West Dairy,  M.A. &
Sons Chili Products and Insurer-Respondent and for Insurer-Petitioner Food
Industry Self Insurance Fund of New Mexico

New Mexico Center on Law and Poverty
Gail Evans
Albuquerque, NM

for Worker-Respondents Noe Rodriguez and Maria Angelica Aguirre

Modrall Sperling Roehl Harris & Sisk
Emil J. Kiehne
Sarah M. Stevenson
Albuquerque, NM

for Amicus Curiae New Mexico Farm and Livestock Bureau

Rachel A. Bayless, Special Assistant Attorney General
Albuquerque, NM

for Amicus Curiae New Mexico Workers' Compensation Administration


Michael B. Browde
David J. Stout
Albuquerque, NM

for Amicus Curiae New Mexico Trial Lawyers Association

**OPINION**

**CHÁVEZ, Justice.**

{1}    The New Mexico Workers' Compensation Act (Act), NMSA 1978, §§ 52-1-1 to -70 (1917, as amended through 2015), has never required employers to provide workers' compensation coverage to farm and ranch laborers.  These consolidated appeals require us to resolve whether this exclusion violates the rights of those workers under the Equal Protection Clause of Article II, Section 18 of the New Mexico Constitution in light of the fact that other agricultural workers are not singled out for exclusion.  The Equal Protection Clause mandates that, "in order to be legal," ostensibly discriminatory classifications in social and economic legislation "must be founded upon real differences of situation or condition, which bear a just and proper relation to the attempted classification, and reasonably justify a different rule" for the class that suffers the discrimination.  *Burch v. Foy*, 1957-NMSC-017, ¶ 10, 62 N.M. 219, 308 P.2d 199.

{2}    When litigants allege that the government has unconstitutionally discriminated against them, courts must decide the merits of the allegation because if proven, courts must resist shrinking from their responsibilities as an independent branch of government, and refuse to perpetuate the discrimination–regardless of how long it has persisted–by safeguarding constitutional rights.   Such is the constitutional

responsibility of the courts. *Griego v. Oliver*, 2014-NMSC-003, ¶ 1, 316 P.3d 865. We conclude that there is nothing to distinguish farm and ranch laborers from other agricultural employees and that purported government interests such as cost savings, administrative convenience, and other justifications related to unique features of agribusiness bear no rational relationship to the Act's distinction between these groups. This is nothing more than arbitrary discrimination and, as such, it is forbidden by our Constitution. Accordingly, we hold that the farm and ranch laborer exclusion contained in Section 52-1-6(A) of the Act is unconstitutional, and we remand these cases for further proceedings. The Legislature is at liberty to offer economic advantages to the agricultural industry, but it may not do so at the sole expense of the farm and ranch laborer while protecting all other agricultural workers. We also determine that our holding should be given modified prospective application to the cases of Ms. Aguirre and Mr. Rodriguez and to all cases involving an injury that manifests, as defined under the Act, after the date that our mandate issues in this case pursuant to Rule 12-402(B) NMRA.

**I.      BACKGROUND**

{3}      In 2012, Maria Angelica Aguirre worked as a chile picker in Doña Ana County for M.A. & Sons Chili Products (M.A. & Sons) for a weekly wage of approximately

2

$300.[1]  Ms. Aguirre claims that she slipped in a field and broke her wrist while picking chiles.  Ms. Aguirre claims that her injury required surgery and rehabilitative therapy, she still has trouble with her wrist, and she is limited in her ability to do farm work.  M.A. & Sons had workers' compensation insurance at the time of the alleged injury.

{4}      In March 2013, Ms. Aguirre filed a workers' compensation complaint seeking compensation for temporary total disability, permanent partial disability, medical benefits, and attorney fees.  M.A. & Sons and its insurer, the Food Industry Self Insurance Fund of New Mexico (Self Insurance Fund), raised several defenses to Ms. Aguirre's complaint, including the contention that her claims were barred by the farm and ranch laborer exclusion in Section 52-1-6(A), which provides that the Act "shall not apply to employers of . . . farm and ranch laborers."  In January 2014, Ms. Aguirre filed a motion for partial summary judgment, asking the workers' compensation judge (WCJ) to conclude that the farm and ranch laborer exclusion had been declared unconstitutional; therefore, it did not bar her case.  To support her argument, Ms. Aguirre attached materials related to the 2012 judgment in *Griego v. New Mexico*

[1]M.A. & Sons disputes that Ms. Aguirre was its "employee" under the Act. However, for the purposes of this appeal, they agree that we should treat Ms. Aguirre as though she would otherwise be eligible for workers' compensation benefits except for the Section 52-1-6(A) exclusion.

*Workers' Compensation Administration*, No. CV 2009-10130, a case that was brought by New Mexico farm laborers in the Second Judicial District Court. In *Griego*, the district court declared that the farm and ranch laborer exclusion violated the constitutional equal protection rights of the claimants in that case and entered an order against the Workers' Compensation Administration (the Administration). The Administration then appealed the district court's ruling on jurisdictional grounds and, in an unpublished memorandum opinion, the Court of Appeals dismissed the claim as moot, and further stated that because the Administration had not sought review of the constitutional issue, the Court would not "examine []or draw any conclusions about it," other than to say that the Administration "cannot now escape the effect of unchallenged parts of the district court's decision." *Griego v. N.M. Workers' Comp. Admin.*, No. 32,120, mem. op. ¶¶ 1, 11 (N.M. Ct. App. Nov. 25, 2013) (non-precedential). The WCJ took judicial notice of the materials from *Griego* and admitted them for purposes of Ms. Aguirre's motion for partial summary judgment. The WCJ then denied her motion and dismissed her claim with prejudice on the basis of the farm and ranch laborer exclusion.

{5}     In 2012, Noe Rodriguez worked as a dairy worker and herdsman at Brand West Dairy, earning just under $1000 every two weeks for working six days a week for

4

eight hours per day. Mr. Rodriguez alleges that he was pushed up against a door by a cow and then head-butted by the cow, which caused him to fall face first onto a cement floor. He alleges that he suffered a traumatic brain injury, a neck injury, and facial disfigurement and that he was in a coma for two days. According to Mr. Rodriguez, as of July 2013, he had still not been cleared by a doctor to return to work. He alleges that his employer, which did not have workers' compensation insurance, provided him with two checks for $600 after the accident.

{6}     In February 2013, Mr. Rodriguez filed a workers' compensation complaint seeking compensation for temporary total disability, permanent partial disability, disfigurement, medical benefits, and attorney fees. In July 2013, the New Mexico Uninsured Employers' Fund (the UEF), which acts as the insurer for businesses without workers' compensation insurance, *see* § 52-1-9.1, moved to dismiss Mr. Rodriguez's claims because of the farm and ranch laborer exclusion. Mr. Rodriguez responded by arguing that the WCJ was obligated to follow the district court's ruling in *Griego* and that the exclusion was unconstitutional. He attached a large quantity of materials from *Griego* to his motion, some of which were admitted by the WCJ. The WCJ granted the UEF's motion and dismissed Mr. Rodriguez's case based on the exclusion.

{7} Pursuant to NMSA 1978, Section 52-5-8(A) (1989), Ms. Aguirre and Mr. Rodriguez (collectively "Workers") appealed directly to the Court of Appeals, where their appeals were consolidated. *Rodriguez v. Brand W. Dairy*, 2015-NMCA-097, ¶ 1, 356 P.3d 546, *cert. granted*, 2015-NMCERT-008. Applying rational basis review, the Court of Appeals struck down the farm and ranch laborer exclusion as a violation of Workers' equal protection rights under Article II, Section 18 of the New Mexico Constitution. *Rodriguez*, 2015-NMCA-097, ¶¶ 11, 31. The Court then applied its holding on a modified prospective basis to any workers whose claims were pending as of March 30, 2012, and any claims filed after the date of the district court's final judgment in *Griego*. *Rodriguez*, 2015-NMCA-097, ¶ 37.

{8} The UEF appealed to this Court only on the issue of the Court of Appeals' modified prospective application of its holding. Brand West Dairy, M.A. & Sons, and the Self Insurance Fund (collectively "Employers") appealed to this Court to seek review of both the constitutional issue and the modified prospective application of the holding. We granted both petitions.

## II. THE FARM AND RANCH LABORER EXCLUSION VIOLATES ARTICLE II, SECTION 18 OF THE NEW MEXICO CONSTITUTION

{9} Workers contend that the farm and ranch laborer exclusion contained in Section 52-1-6(A) violates their equal protection rights under the New Mexico

6

Constitution and does not survive under any level of scrutiny. Article II, Section 18 of the New Mexico Constitution provides that no person "shall . . . be denied equal protection of the laws." "Like its federal equivalent, this is essentially a mandate that similarly situated individuals be treated alike, absent a sufficient reason to justify the disparate treatment." *Wagner v. AGW Consultants*, 2005-NMSC-016, ¶ 21, 137 N.M. 734, 114 P.3d 1050. Under our equal protection analysis, we must first determine "whether the legislation creates a class of similarly situated individuals and treats them differently." *Griego*, 2014-NMSC-003, ¶ 27. If so, "we then determine the level of scrutiny that applies to the challenged legislation and conclude the analysis by applying the appropriate level of scrutiny to determine whether the legislative classification is constitutional." *Id.*

{10} We review the constitutionality of legislation de novo. *See Rodriguez v. Scotts Landscaping*, 2008-NMCA-046, ¶ 8, 143 N.M. 726, 181 P.3d 718. During that review, we will not "question the wisdom, policy, or justness of legislation enacted by our Legislature," and will presume that the legislation is constitutional. *Madrid v. St. Joseph Hosp.*, 1996-NMSC-064, ¶ 10, 122 N.M. 524, 928 P.2d 250. The party challenging the legislation therefore bears the burden of demonstrating that the law is unconstitutional. *Id.* To that end, "[a] statute will not be declared unconstitutional

7

unless the court is satisfied beyond all reasonable doubt that the legislature went outside the constitution in enacting the challenged legislation." *Benavides v. E. N.M. Med. Ctr.*, 2014-NMSC-037, ¶ 43, 338 P.3d 1265 (internal quotation marks and citation omitted).

**A.    The farm and ranch laborer exclusion results in dissimilar treatment of similarly situated individuals**

{11}    To determine whether the farm and ranch laborer exclusion in Section 52-1-6(A) violates Workers' equal protection rights, we must first decide "whether the legislation at issue results in dissimilar treatment of similarly-situated individuals." *Madrid*, 1996-NMSC-064, ¶ 35.  This inquiry requires us to "look beyond the classification to the purpose of the law." *Oliver*, 2014-NMSC-003, ¶ 30 (internal quotation marks and citations omitted); *see also Stanton v. Stanton*, 421 U.S. 7, 13-14 (1975) ("The [Federal Equal Protection] Clause . . . denies to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute." (internal quotation marks and citation omitted)).  For example, in *Oliver*, this Court determined that same-gender couples seeking to marry in New Mexico were similarly situated to opposite-gender couples seeking to marry because both groups shared common purposes that were essential to New Mexico's marriage laws.  2014-

NMSC-003, ¶¶ 36-38.  Similarly, in *New Mexico Right to Choose/NARAL v. Johnson*, 1999-NMSC-005, ¶ 44, 126 N.M. 788, 975 P.2d 841, we held that men and women who qualified for Medicaid were similarly situated for the purposes of both state and federal Medicaid laws because those laws were intended to provide qualifying individuals with access to necessary medical care.  Therefore, a rule prohibiting the use of state funds to pay for medically necessary abortions improperly treated men and women differently.  *Id.* ¶¶ 45-47.  By contrast, in *City of Albuquerque v. Sachs*, 2004-NMCA-065, ¶¶ 11-16, 135 N.M. 578, 92 P.3d 24, the Court of Appeals determined that men and women were not similarly situated under a local ordinance prohibiting public nudity because men and women possess different physical characteristics which make the exposure of a woman's breast "nudity," but not the exposure of a man's breast.  The law's classification that distinguished men from women was therefore "properly based on a unique characteristic" of women.  *Id.* ¶ 11. In other words, the reliance on differences in classifying men and women under the ordinance was essential to accomplishing the law's purpose:  "to prohibit any person from knowingly or intentionally being nude in a public place."  *Id.* ¶ 14.

{12}    In this case, we will first examine the Act's text to ascertain its purposes. NMSA 1978, Section 52-5-1 (1990) states the Legislature's intent that the Act

"assure the quick and efficient delivery of indemnity and medical benefits to injured and disabled workers at a reasonable cost to . . . employers . . . ." We have previously interpreted this provision to encompass three of the Act's objectives: "(1) maximizing the limited recovery available to injured workers, in order to keep them and their families at least minimally financially secure; (2) minimizing costs to employers; and (3) ensuring a quick and efficient system." *Wagner*, 2005-NMSC-016, ¶ 25. The Act also instructs that it is "not to be given a broad liberal construction in favor of the claimant or employee on the one hand, nor are the rights and interests of the employer to be favored over those of the employee on the other hand." Section 52-5-1. This provision requires us to "balance equally the interests of the worker and the employer without showing bias or favoritism toward either." *Salazar v. Torres*, 2007-NMSC-019, ¶ 10, 141 N.M. 559, 158 P.3d 449.

{13} With these general principles in mind, we will also examine the structure and operation of the entire Act as an indicator of its purposes. *See Oliver*, 2014-NMSC-003, ¶¶ 34-35 (examining New Mexico's marriage laws together to ascertain their collective underlying purposes). For workers subject to the Act, the statute provides the exclusive remedy for injuries or death "caused by accident" and which arise out of the course of the worker's employment, § 52-1-9, including accidents caused by

10

an employer's negligence, *Delgado v. Phelps Dodge Chino, Inc.*, 2001-NMSC-034, ¶ 12, 131 N.M. 272, 34 P.3d 1148. The exclusivity of workers' compensation remedies for accidents and negligence is advantageous to employers because it limits their potential liability for workplace injuries by preventing workers from pursuing "the unpredictable damages available outside [the Act's] boundaries." *Id.* ¶ 12. Instead, workers receive a predictable recovery amount because it is highly regulated by statute. *See, e.g.*, §§ 52-1-26 to -26.4 (establishing detailed guidelines for determining award amounts for a partial disability covered under the Act). In exchange, "[t]he injured worker receives compensation quickly, without having to endure the rigors of litigation or prove [an employer's] fault[.]" *Delgado*, 2001-NMSC-034, ¶ 12. Additionally, the workers' compensation system eliminates employer defenses that frequently prevented injured workers from recovering for workplace injuries under the common law. *See* § 52-5-1; *see also Hisel v. Cty. of Los Angeles*, 238 Cal. Rptr. 678, 682 (Ct. App. 1987) ("From the beginning, it was a principal purpose of workers' compensation laws to eliminate . . . common law defenses that had prevented recovery for injuries received on the job . . . ."). We have also previously recognized the Act's "design[] to . . . protect[] society by shifting the burden of caring for injured workers away from society and toward industry[,]" and

thus "to prevent the worker from becoming a public charge and to assist the worker in returning to work . . . ." *Breen v. Carlsbad Mun. Sch.*, 2005-NMSC-028, ¶ 36, 138 N.M. 331, 120 P.3d 413 (internal quotation marks and citation omitted).

{14} We must also consider the history of New Mexico's workers' compensation laws to fully understand their current exclusion of farm and ranch laborers. *See Oliver*, 2014-NMSC-003, ¶¶ 30-31 (examining the history of New Mexico marriage laws for clues regarding the purposes of those laws). Farm and ranch laborers have never been included in New Mexico's workers' compensation system. The Act's initial version, passed in 1917, only applied to "extra-hazardous occupations or pursuits" which were specifically enumerated by the Legislature and did not include any kind of agricultural labor. *See* 1917 N.M. Laws, ch. 83, §§ 2, 10. In 1937, the Legislature added an explicit exclusion of "farm and ranch laborers." 1937 N.M. Laws, ch. 92, § 2. Because the Act still only applied to certain "extra-hazardous occupations or pursuits[,]" *id.* § 1, farm and ranch laborers were therefore doubly excluded from the workers' compensation system. In 1975, the Legislature repealed the workers' compensation system's limitation to extra-hazardous pursuits or occupations, *see* 1975 N.M. Laws, ch. 284, § 14, and instead applied the Act more broadly to include private employers employing four or more workers, *see id.* § 3.

Employers of farm and ranch laborers were still explicitly excluded from the Act. *Id.* Today the Act is generally mandatory for private employers with three or more employees, except for employers of private domestic servants and farm and ranch laborers. *See* § 52-1-6(A). Employers of farm and ranch laborers can instead affirmatively elect to provide workers' compensation coverage for those workers. Section 52-1-6(B).

{15} The exclusion now provides that "[t]he provisions of the Workers' Compensation Act shall not apply to employers of . . . farm and ranch laborers." Section 52-1-6(A). Because a "literal interpretation" of this language would lead to "absurd results[,]" the provision has long been applied only to workers employed as farm and ranch laborers and not to every individual employee working for an employer of farm and ranch laborers. *Cueto v. Stahmann Farms, Inc.*, 1980-NMCA-036, ¶ 6, 94 N.M. 223, 608 P.2d 535; *see also Holguin v. Billy the Kid Produce, Inc.*, 1990-NMCA-073, ¶ 19, 110 N.M. 287, 795 P.2d 92 ("[T]he determination of whether a particular worker is a farm laborer is based on the nature of the employee's primary job responsibilities, not the nature of the employer's business."). Otherwise, employers could "exempt their entire work force from the act by employing a few farm and ranch laborers[,]" which would thwart the Legislature's intent to "exempt

13

agricultural labor" from the workers' compensation system. *Cueto*, 1980-NMCA-036, ¶ 6. In other words, a worker who occasionally performs the tasks of a farm or ranch laborer is not necessarily classified as such if he or she is primarily employed for a different purpose, and likewise, a worker working as a farm or ranch laborer, is still classified as a farm or ranch laborer even when he or she is performing a work-related duty that would normally be performed by a non-excluded worker, such as driving a truck or packaging the product. *See Holguin*, 1990-NMCA-073, ¶ 9 ("[T]he general character of the employment is controlling, even though the worker may in fact have been injured while performing a service that is not farm labor.").

{16}    A worker is classified as a farm or ranch laborer for purposes of the Act when "the worker's primary responsibility is performed on the farming premises and is an essential part of the cultivation of the crop[.]" *Id.* For instance, in *Holguin*, the Court of Appeals determined that a worker who primarily filled and stacked sacks of onions in an onion shed was not a farm laborer under Section 52-1-6(A). 1990-NMCA-073, ¶¶ 3-5, 20. Several years later, the Court of Appeals held that a beekeeper's assistant, whose primary duties involved harvesting honey by helping to extract it from bee hives, was a farm laborer under Section 52-1-6(A). *Tanner v. Bosque Honey Farm, Inc.*, 1995-NMCA-053, ¶¶ 2-3, 12, 119 N.M. 760, 895 P.2d 282; *see also Cueto*,

14

1980-NMCA-036, ¶¶ 1, 3, 9 (holding that a worker whose primary duty was manufacturing fertilizer by maintaining a compost heap, a process that was "an essential part of the cultivation of pecans[,]" was a farm laborer under Section 52-1-6(A)). Therefore, under the exclusion, the same agricultural employer could be exempt from providing mandatory workers' compensation coverage for a worker who harvests an agricultural product in the field, but still be required to provide workers' compensation to workers who process and package that same product because that task is merely "incidental" to farming. *See Tanner*, 1995-NMCA-053, ¶¶ 7, 11.

{17} We hold that the farm and ranch laborers who are excluded by Section 52-1-6(A) are similarly situated to other employees of agricultural employers with respect to the purposes of the Act. In light of the purposes of the Act discussed above, we conclude that there is no unique characteristic that distinguishes injured farm and ranch laborers from other employees of agricultural employers, and such a distinction is not essential to accomplishing the Act's purposes. *Cf. Sachs*, 2004-NMCA-065, ¶¶ 13-16 (distinguishing men from women to accomplish the objective of a city ordinance). Rather, the same mutually beneficial trade-off in rights between employers and employees apply equally to farm and ranch laborers and their employers. *See Oliver*, 2014-NMSC-003, ¶¶ 36-38 (determining that same-gender

15

and opposite-gender couples were similarly situated with respect to the benefits associated with marriage in New Mexico); *see also Stanton*, 421 U.S. at 15 (holding that boys and girls were similarly situated for the purposes of a statute specifying the age of majority for child support payments because "[i]f a specified age of minority is required for the boy in order to assure him parental support while he attains his education and training, so, too, is it for the girl"). Indeed, the classification resulting from the exclusion is contrary to the Act's goal of balancing the rights of employees and employers because it allows the employers of only this excluded class of workers to unilaterally opt into or out of the workers' compensation system—a choice that the same employers do not have with respect to any other employees. *See* § 52-1-6(A), (B). Workers also have shown that it does not further the Act's purposes defined in Section 52-5-1 to impose a negligence standard on accidental workplace injuries suffered by employees who work primarily as farm and ranch laborers, while applying a no-fault system to all other workplace accidents suffered by employees of agricultural employers, including those who occasionally perform the tasks of farm and ranch laborers. *See Holguin*, 1990-NMCA-073, ¶¶ 9-10.

{18} Employers argue that the Act's classification of farm and ranch laborers is a "distinction . . . [which] does not come directly from the challenged legislation, but,

16

instead, comes from the [Court of Appeals'] interpretation and application" of the exclusion. Employers further contend that to define the classification in this manner would be inappropriate and contrary to our prior case law, "where the challenged distinction came directly from the provisions of the Act." Employers' argument does not convince us that the distinction between farm and ranch laborers exempt from the Act and other employees of agricultural employers in New Mexico was "created by" the Court of Appeals rather than the Act.

{19}     Contrary to Employers' contention, our equal protection jurisprudence requires us to consider how courts have interpreted legislative language to define classifications created by a statute. For example, in *Oliver* we had to determine whether, when read as a whole, New Mexico's marriage laws authorized or prohibited same-gender marriage, "despite the lack of an express legislative prohibition against same-gender marriage . . . ." 2014-NMSC-003, ¶ 24. Even though New Mexico's marriage statutes contained a mixture of gender-neutral and gender-specific language, we interpreted the statutory scheme to reflect a legislative intent to prohibit same-gender marriages. *Id.* ¶ 23. We then considered whether same-gender couples seeking to marry were similarly situated to opposite-gender couples seeking to marry based on the distinction between those two groups created by the interpretation of

17

prohibition. *See id.* ¶¶ 28-38. Similarly, courts have interpreted the farm and ranch laborer exclusion to create a distinction between employees whose work is essential to cultivating crops or who work directly with livestock and other employees whose work is not essential to those goals by reasoning that any other interpretation would be absurd to the extent that it would not be in accord with the Legislature's wishes. *See Cueto*, 1980-NMCA-036, ¶ 6.

{20} The Legislature's failure to change or clarify judicial interpretations of the exclusion indicates its intent that the exclusion should be applied to a distinct *subset* of employees as defined by case law. In the context of the Act and its predecessors, this Court has long interpreted agricultural labor to include only workers whose primary responsibilities were directly related, not incidental, to agricultural pursuits.[2]

---

[2]The dissent places substantial emphasis on *Williams v. Cooper*, 1953-NMSC-050, 57 N.M. 373, 258 P.2d 1139. *See* diss. op. ¶¶ 73-74, 76, 81. *Williams* interpreted the since-repealed provision that applied workers' compensation only to those employers engaged in extra-hazardous occupations or pursuits under NMSA 1941, Section 57-910 (1941). *See* 1953-NMSC-050, ¶ 12. Significantly, the phrase "occupations or pursuits" was given further context by NMSA 1941, Section 57-902 (1941), which limited the Act's application to private businesses "engaged in carrying on for the purpose of business, trade or gain . . . either or any of the extra-hazardous occupations or pursuits named or described" by the Act and to injuries suffered "by accident arising out of and in the course of [a worker's] employment in any such occupation or pursuit." Yet, as we have already described, *see supra*, maj. op. ¶ 14, the extra-hazardous occupations limitation was excised from the Act more than four decades ago, and the modern version of the Act does not broadly restrict its application based on the occupations or pursuits of the employer. *See* § 52-1-2. In

18

*See Koger v. A. T. Woods, Inc.*, 1934-NMSC-020, ¶¶ 17-20, 38 N.M. 241, 31 P.2d 255. *Cueto* further clarified that a worker's primary responsibilities had to be essential to cultivating crops for his or her work to be directly related to agriculture. 1980-NMCA-036, ¶ 9. Because the Legislature has not taken any steps in the interim to correct or change these long-standing interpretations related to the exclusion, their inactivity is an endorsement of the case law, absent any evidence to the contrary. *See State v. Chavez*, 2008-NMSC-001, ¶ 21, 143 N.M. 205, 174 P.3d 988 ("The Legislature's continuing silence on the issue we confront herein is further evidence that it was both aware of and approved of the existing case law . . . . If the Legislature had intended to modify or clarify those rules, it would have done so expressly . . . ."). Further, the only recent amendment related to the exclusion, *see* 1984 N.M. Laws, ch. 127, § 988.3, also acknowledged that certain employees should be classified as farm and ranch laborers based on whether they directly work with crops or animals in an agricultural setting. *See* § 52-1-6.1.

{21} Employers next argue that New Mexico courts have already determined that farm and ranch laborers are not similarly situated to New Mexico workers in *Holguin* and *Tanner* who are not exempt from the Act. In other words, according to

any event, workers whose primary responsibilities were directly related, not incidental, to agricultural pursuits have always been a part of the test.

Employers, the Court of Appeals' determination in those cases that some workers were farm and ranch laborers for purposes of Section 52-1-6(A) while others were not was tantamount to holding that workers who harvest crops or directly participate in farming activities are "not similarly situated" for equal protection purposes to workers who perform tasks such as processing and packaging crops. This definition of "similarly situated" based on assigned tasks would eviscerate equal protection rights. Indeed, the logical extension of Employers' argument is that no class defined by legislation can ever be similarly situated to individuals outside that class because those outside the class do not possess the trait that defines the class. "[S]imilarly situated cannot mean simply similar in the possession of the classifying trait. All members of any class are similarly situated *in this respect* and consequently, any classification whatsoever would be reasonable by this test." *N.M. Right to Choose/NARAL*, 1999-NMSC-005, ¶ 39 (emphasis added) (internal quotation marks and citation omitted). Thus, there is no merit to Employers' argument that prior cases determining the scope of Section 52-1-6(A) are dispositive of whether injured farm and ranch laborers are similarly situated to other injured workers of agricultural employers.

{22}     Having decided that the exclusion creates differential treatment among

20

similarly situated employees, we will now determine the appropriate level of scrutiny to apply. *See Breen*, 2005-NMSC-028, ¶ 11.

**B.     Rational basis review is appropriate**

{23}     "There are three levels of equal protection review based on the New Mexico Constitution:  rational basis, intermediate scrutiny and strict scrutiny." *Id.*  "In analyzing which level of scrutiny should apply in an equal protection challenge, a court should look at all three levels to determine which is most appropriate based on the facts of the particular case." *Id.* ¶ 15.  "What level of scrutiny we use depends on the nature and importance of the individual interests asserted and the classifications created by the statute." *Wagner*, 2005-NMSC-016, ¶ 12.  "Rational basis review applies to general social and economic legislation that does not affect a fundamental or important constitutional right or a suspect or sensitive class."  *Breen*, 2005-NMSC-028, ¶ 11. Under rational basis review, the challenger must demonstrate that the legislation is not rationally related to a legitimate government purpose. *Id.* However, legislation can trigger a review under intermediate scrutiny where it "either (1) restrict[s] the ability to exercise an important right or (2) treat[s] the person or persons challenging the constitutionality of the legislation differently because they belong to a sensitive class." *Id.* ¶ 17.  Under intermediate scrutiny, the party

21

supporting the legislation must show that it is substantially related to an important government interest. *Id.* ¶ 13. Finally, strict scrutiny applies when "a law draws suspect classifications or impacts fundamental rights." *Wagner*, 2005-NMSC-016, ¶ 12. In that instance, the party supporting the legislation must demonstrate that "that the provision at issue is closely tailored to a compelling government purpose." *Id.*

{24} The Act is general social and economic legislation, and the benefits that it confers do not rise to the level of important or fundamental rights. *See Breen*, 2005-NMSC-028, ¶ 17. Further, Workers have not provided any argument for classifying farm or ranch laborers as a sensitive or suspect class before this Court. Therefore, we will apply rational basis review in this case. *See State ex rel. Human Servs. Dep't v. Staples* (*In re Doe*), 1982-NMSC-099, ¶ 3, 98 N.M. 540, 650 P.2d 824 (courts should strive to avoid deciding legal arguments not raised by the parties).

**C.     The exclusion fails rational basis review**

{25} In *Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶ 32, 125 N.M. 721, 965 P.2d 305, we adopted a rational basis test different than the federal rational basis test. We rejected a fourth tier of "heightened" rational basis analysis and instead adopted a "modern articulation" of the rational basis test that "subsum[ed] that fourth tier" of review and "address[ed] the concerns" of heightened rational basis analysis. *Id.*

22

(internal quotation marks and citations omitted).  In *Wagner*, we clarified that the rational basis test adopted by *Trujillo* requires the challenger to "demonstrate that the classification created by the legislation is not supported by a firm legal rationale or evidence in the record."  *Wagner*, 2005-NMSC-016, ¶ 24 (internal quotation marks and citation omitted).  The New Mexico rational basis test is therefore similar to the federal heightened rational basis test.  *See, e.g.*, *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985).

{26}     However, for claims under the United States Constitution, we still follow the federal rational basis test, which only requires a reviewing court to divine "the *existence* of a conceivable rational basis" to uphold legislation against a constitutional challenge.  *Kane v. City of Albuquerque*, 2015-NMSC-027, ¶ 17, 358 P.3d 249 (internal quotation marks and citation omitted).  Under the federal test, "those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it."  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (internal quotation marks and citation omitted).  Accordingly, a law "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Id.* at 313.  Legislation can therefore survive a constitutional challenge under the

23

federal test based solely on a judge's "rational speculation [that is] unsupported by evidence or empirical data." *Id.* at 315.

{27} In *Trujillo*, we rejected this version of the rational basis test and noted that critics had fairly characterized it as "toothless" and "a virtual rubber-stamp[.]" 1998-NMSC-031, ¶ 30 (internal quotation marks and citations omitted). Our opinion in *Trujillo* implicitly addressed Justice Stevens' concern in *Beach Communications* that the federal test "sweeps too broadly, for it is difficult to imagine a legislative classification that could *not* be supported by a 'reasonably conceivable state of facts[,]' " and his statement that judicial review under this test is therefore "tantamount to no review at all." 508 U.S. at 323 n.3 (Stevens, J., concurring); *see also* Clark Neily, *No Such Thing: Litigating Under the Rational Basis Test*, 1 N.Y.U. J.L. & Liberty 898, 905-913 (2005) (arguing that the federal rational basis test invites dishonest and entirely speculative defenses of legislation; "[s]addl[es] . . . plaintiffs with a technically unattainable burden of proof and requir[es] them to construct a trial court record sufficient to rebut arguments that have not even been made yet"; and is particularly subject to inconsistent, result-based interpretations). Thus, while we remain highly deferential to the Legislature by presuming the constitutionality of social and economic legislation, our approach is also cognizant of our constitutional

24

duty to protect discrete groups of New Mexicans from arbitrary discrimination by political majorities and powerful special interests. *See* Steven M. Simpson, *Judicial Abdication and the Rise of Special Interests*, 6 Chap. L. Rev. 173, 174, 188-204 (2003) (arguing that discriminatory "special interest legislation flourishes when courts refuse to play their proper role of policing the political branches of government"); Austin Raynor, Note, *Economic Liberty and the Second-Order Rational Basis Test*, 99 Va. L. Rev. 1065, 1093-1101 (2013) (arguing that federal rational basis review is insufficient to protect discrete groups with little chance to influence changes in the law from certain "vested interests" that have "powerful economic incentives" to discriminate against those discrete groups in the pursuit of "inflated profits"). To that end, our more robust standard establishes rational basis review in arguments and evidence offered by the challengers or proponents of a law rather than requiring the challengers to anticipate and address every stray speculation that may pop into a judge's head at any point in the case. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 442 (1982) (Blackmun, J., separate opinion) (concluding that "[t]he State's rationale must be something more than the exercise of a strained imagination; while the connection between means and ends need not be precise, it, at the least, must have some objective basis[,]" and rejecting a proffered basis for

legislation where it had "so speculative and attenuated a connection to its goal as to amount to arbitrary action").

{28} Returning to the case before us, the classification of farm and ranch laborers must be upheld unless Workers prove it is "not rationally related to a legitimate government purpose." *Wagner*, 2005-NMSC-016, ¶ 12. To prove the lack of a rational relationship, they "must demonstrate that the classification created by the legislation is not supported by a firm legal rationale or evidence in the record." *Id.* ¶ 24 (internal quotation marks and citation omitted). In practical terms, our rational basis standard requires the challenger to bring forward record evidence, legislative facts, judicially noticeable materials, case law, or legal argument to prove that the differential treatment of similarly situated classes is arbitrary, and thus not rationally related to the articulated legitimate government purposes. Proponents of the classification are, of course, free to draw a court's attention to similar evidence to rebut the challengers' arguments or to set forth additional government purposes that the challengers must then prove are not supported by a firm legal rationale or evidence in the record.

{29} For example, one approach available for challengers to prove the lack of a rational relationship under our test is by demonstrating that the classification is

grossly over- or under-inclusive with respect to an articulated government purpose, such that the relationship between the classification and its purpose is too attenuated to be rational, and instead amounts to arbitrary discrimination. For example, in *City of Cleburne*, the United States Supreme Court applied a heightened rational basis standard similar to our test and struck down a zoning ordinance imposing special administrative hurdles on group homes for the intellectually and developmentally disabled. *See* 473 U.S. at 449-50. The Court rejected several purported rational bases offered by the law's proponents because the law did not provide a close enough fit with those bases. *See id.* Proponents of the zoning law argued that there was a legitimate government interest in requiring a permit for the facility in that case because it would be located on a flood plain. *Id.* at 449. The Court determined that the ordinance was not rationally related to the government interest in protecting people from floods because that concern would apply equally to a variety of other group facilities housing vulnerable populations, none of which would have been required to obtain a permit, and therefore could "hardly be based on a distinction between [a home for the intellectually and developmentally disabled] and, for example, nursing homes, homes for convalescents or the aged, or sanitariums or hospitals . . . ." *Id.* The Court also rejected an argument that "the ordinance is aimed

27

at avoiding concentration of population and at lessening congestion of the streets[,]" since those concerns would apply equally to other group housing such as "apartment houses, fraternity and sorority houses, hospitals and the like," none of which were singled out in the same manner by the zoning law. *Id.* at 450. In other words, despite the existence of legitimate government interests in protecting people from floods and preventing overpopulation and congestion, and despite the fact that there was likely *some* relationship between requiring special permits for group homes for the intellectually and developmentally disabled and those interests, singling out one particular group among other similarly-situated groups was grossly under-inclusive with respect to these interests, and therefore the challengers had proved the absence of a rational relationship.

{30} The United States Supreme Court similarly has not found a rational relationship when a law is grossly over-inclusive in addressing a purported government interest. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 536-38 (1973) (striking down related-household limitations on food stamp eligibility under the Food Stamp Act as not rationally related to the purpose of preventing fraud because the provision appeared to largely exclude from the food stamp program individuals who were not committing fraud, but rather were too poor to alter their living arrangements); *see*

28

*also Barletta v. Rilling*, 973 F. Supp. 2d 132, 138 (D. Conn. 2013) ("The statute, in other words, is both grossly over-inclusive and grossly under-inclusive as a proxy for serving the State's stated goals. To survive even rational basis review, the defendants and the State must do more than suggest that *some* felons would be unsuitable for licensure. Most irrational classifications, for example, left-handed people, obese people, people with tattoos, people born on the first day of the month, divorced people and college dropouts, will include *some* persons properly excluded from licensure. Such occasional coincidence between membership in the excluded class and the purpose of the licensing requirement is not sufficient to advance a legitimate government interest." (internal quotation marks and citation omitted)). Therefore, inclusiveness can be a valuable rubric for evaluating the relationship between a classification and a government purpose under our rational basis test.

{31} We will now apply our rational basis test to this case. The following rationales have been articulated for the Section 52-1-6(A) classification of farm and ranch laborers: (1) cost savings for agricultural employers; (2) administrative convenience; (3) unique economic aspects of agriculture; (4) protection of New Mexico's farming and ranching traditions; and (5) the application of tort law to workplace injuries suffered by farm and ranch laborers. We hold that Workers have demonstrated that

29

there is neither evidence in the record nor firm legal rationale sufficient to establish a rational relationship between the exclusion and any of these purposes.

{32} **First,** Workers have demonstrated that there is neither evidence in the record nor firm legal rationale showing a rational relationship between the exclusion's classification of farm and ranch laborers and a purported interest in reducing overhead costs to the New Mexico agricultural industry. According to Employers, the exclusion is intended to reduce costs to farmers and consumers by saving the cost of providing workers' compensation insurance to farm and ranch laborers. On appeal, amicus curiae New Mexico Farm and Livestock Bureau (the Bureau) introduced Fiscal Impact Reports (FIRs) to support the argument that the exclusion saves overhead costs for farm and ranch employers. *See* FIR for H.B. 80 (Jan. 19, 2007) (2007 FIR), *available at* http://www.nmlegis.gov/Sessions/07%20Regular/ firs/HB0080.pdf (last viewed June 1, 2016); FIR for H.B. 62 (Feb. 5, 2009) (2009 FIR), *available at* http://www.nmlegis.gov/Sessions/ 09%20Regular/firs/HB0062.pdf (last viewed June 1, 2016). Employers also contend that this Court's analysis in *Wagner* requires us to consider lowering costs to employers as a legitimate government purpose to effectuate the Legislature's intent that the Act be interpreted to balance the rights of employers and employees. *See* § 52-5-1. However, the

statement in *Wagner* that reducing employer costs is a purpose of the Act referred to reducing employer costs *within* the workers' compensation system; it did not stand for the self-contradictory proposition that one of the Act's purposes is to reduce costs for employers by exempting them from the Act entirely. *See* 2005-NMSC-016, ¶ 25.

{33} As to the more general cost savings argument, Workers have met their burden by demonstrating that there is neither firm legal rationale nor evidence in the record to establish a rational relationship between this purpose and the differential treatment of farm and ranch laborers under the Act. This Court has previously recognized that while "lowering employer costs" is a "valid legislative goal" of the Act, rational basis review, at a minimum, still requires that a cost-saving classification "be based upon some substantial or real distinction, and not artificial or irrelevant differences." *Schirmer v. Homestake Mining Co.*, 1994-NMSC-095, ¶ 9, 118 N.M. 420, 882 P.2d 11. In *Schirmer*, we upheld a challenge to a statute barring claims for compensation based on injuries resulting from occupational exposure to radioactive or fissionable materials that was brought more than ten years after the employee's last day of work. *Id.* ¶¶ 3-4, 10. In striking down the law as a violation of substantive due process under rational basis review, we determined that while the provision's bar on certain claims "probably reduce[d] costs to employers by eliminating claims[,]" it did so by

"arbitrarily discriminat[ing]" against a discrete group of claimants. *Id.* ¶¶ 9-10.

{34}   Similarly, other jurisdictions have agreed that while cost savings are a legitimate government interest, they cannot be achieved through arbitrary means because if they were the "sole reason for disparate treatment[,] . . . cost containment alone could justify nearly every legislative enactment without regard for . . . equal protection." *Caldwell v. MACo Workers' Comp. Tr.*, 2011 MT 162, ¶ 34, 256 P.3d 923 (internal quotation marks and citations omitted); *see also Harris v. Millenium Hotel*, 330 P.3d 330, 337 (Alaska 2014) (rejecting cost savings justification under rational basis review of workers' compensation provision that excluded same-gender couples from receiving death benefits); *Caldwell*, 2011 MT 162, ¶ 35 ("We must scrutinize attempts to disguise violations of equal protection as legislative attempts to 'contain the costs' or 'improve the viability' of the worker's compensation system. *Cost alone does not justify the disparate treatment of similar classes*." (emphasis added) (citation omitted)); *Arneson v. State ex rel. Dep't of Admin., Teachers' Ret. Div.*, 864 P.2d 1245, 1248 (Mont. 1993) ("[E]ven if the governmental purpose is to save money, it cannot be done on a wholly arbitrary basis. The classification must have some rational relationship to the purpose of the legislation."); *State ex rel. Patterson v. Indus. Comm'n*, 672 N.E.2d 1008, 1012-13 (Ohio 1996) (holding that

conserving funds cannot be the sole reason for a classification denying workers' compensation benefits to a particular group of workers).

{35} Likewise, in this case, even assuming that agricultural operations would face additional costs without the exclusion, these cost savings are only achieved through arbitrary discrimination against farm and ranch laborers. The exclusion does not apply to farm and ranch *employers*, but rather to employees whose primary job responsibilities fit the definition of "farm and ranch laborers" under Section 52-1-6(A). *See Holguin*, 1990-NMCA-073, ¶ 19 (stating that despite the Act's plain language, "the determination of whether a particular worker is a farm laborer is based on *the nature of the employee's primary job responsibilities, not the nature of the employer's business*" (emphasis added)). Therefore, agricultural employers are not fully exempted from the Act because they are still required to cover any employees whose primary responsibilities are not essential to cultivating crops, such as employees who sort or package crops. *See id.* ¶ 20. As a result, the exclusion saves overhead costs for agricultural employers by arbitrarily excluding only farm and ranch laborers, a discrete subset of their potential employees, from coverage. Here we again reject the argument that achieving cost savings for employers by arbitrarily discriminating against a particular group of employees is a legitimate government

33

purpose. *See Schirmer*, 1994-NMSC-095, ¶¶ 9-10.

{36}    **Second,** Workers have met their burden by demonstrating that there is neither evidence in the record nor firm legal rationale showing that the classification of farm and ranch laborers is rationally related to unique administrative challenges created by workers' compensation claims from those workers. According to Employers, farm and ranch laborers are "often seasonal and, as such, are inherently transient." Employers argue that the transience of these workers creates unique difficulties for insurers, including not knowing where to send benefit checks and not knowing where to provide the worker with medical care. Additionally, Employers contend that "some farm and ranch workers . . . are undocumented," which makes them "difficult to locate" and prone to "avoid[ing] contact with governmental authorities," and administering their claims would therefore present a challenge. In support of this argument, the Bureau cites the FIRs from 2007 and 2009. The 2007 FIR repeated the Administration's belief at that time that removing the exclusion would significantly increase the Administration's caseload, require additional staffing, and present logistical challenges due to the transitory nature of some seasonal farm and ranch laborers. *Id.* at 2. Similarly, in the 2009 FIR, the Administration asserted that it would need three more full-time employees to handle an estimated 475 additional

34

claims and estimated that it would need to pay the UEF an additional $24,000 per year due to the increased claims. *Id.* at 2-3.

{37} However, the Administration later contradicted its earlier positions through stipulations entered in *Griego*.[3] In *Griego*, the Administration agreed that "[i]t would be administratively feasible to administer the workers' compensation system with the addition of farm and ranch laborers," including temporary or seasonal workers. The Administration also agreed that coverage of these workers would likely lead to a 1.4% increase in covered workers and a less than 1% increase in caseload. Further,

---

[3]Employers do not directly argue that the *Griego* stipulation should be rejected, but do refer to the "lack of a developed factual record that contains findings that were truly litigated between the parties and made by an independent fact finder." We agree, and therefore do not treat these facts as if Employers have stipulated to them. However, we have considered this stipulation with respect to the administrative convenience rationale because the Administration's statements in *Griego* regarding the feasibility of administering these claims for farm and ranch laborers directly relate to earlier statements attributed to the Administration in the FIRs. These are legislative facts that "do not concern individual parties" in this case, but are rather a "non-evidentiary source[]" of universally- applicable information to help us "determine the content of law and policy." *Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶¶ 25-26, 147 N.M. 583, 227 P.3d 73 (internal quotation marks and citations omitted). Notably, Employers could have also entered competing general factual evidence into the record for purposes of appeal, such as the FIRs, or argued that the stipulation was irrelevant or outdated. *See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 305 F.R.D. 256, 290 (D.N.M. 2015) (concluding that it is appropriate to consider legislative facts contained in a report authored by the U.S. Forest Service, but the U.S. Forest Service was still free to argue that the facts were inapposite or being misused by plaintiffs).

35

the Administration agreed that "[i]t is no more difficult to administer workers' compensation to farm and ranch laborers than it is to administer the program to other covered workers, some of whom are migrant and seasonal, work for multiple employers or are employed by farm labor contractors." The Administration additionally conceded that farm and ranch laborers whose employers already provided voluntary coverage under the Act "do not pose any special difficulties for the . . . Administration." Finally, the Administration agreed that the additional administrative costs associated with covering more workers "would be covered by fees collected from workers and employers" pursuant to the Act. Therefore, the Administration's most recent statements regarding the exclusion severely undermine earlier statements in the record regarding the administrative convenience rationale for the exclusion.

{38}    Workers have demonstrated that the exclusion does not rationally relate to administrative convenience in the workers' compensation system. The Section 52-1-6(A) exclusion is grossly under- and over-inclusive with respect to the purported government interest of avoiding administrative difficulties in the workers' compensation system so that it is not rationally related to the goal of ensuring the Act's quick and efficient administration. *See Wagner*, 2005-NMSC-016, ¶ 25 (emphasizing the particularly important goal of maximizing workers' recovery among

36

the Act's goals that also include "ensuring a quick and efficient system"); § 52-5-1 (articulating the goal of "quick and efficient" administration). As Workers observe, "the [Administration] and private insurance companies already administer claims in the construction, service and roofing industries, which, like agriculture, sometimes involve sub-contractors, part-time employees, multiple employers, seasonality and frequent changes in employers," and presumably undocumented employees as well. Indeed, the Act does not exclude *any* other employees who work in industries that rely on substantial seasonal or temporary labor. It is arbitrary to exclude a subset of workers from just one industry based on concerns regarding administrative convenience that are not even remotely unique to that industry. The exclusion is thus so grossly under-inclusive in addressing any purported problems with administering claims that it is not rationally related to that interest. *See Vision Mining, Inc. v. Gardner*, 364 S.W.3d 455, 472 (Ky. 2011) ("Nor can the disparate treatment of coal workers be justified as a[n administrative] cost-saving measure, as it is axiomatic that, if the enhanced procedure saves money, the state would save more money by subjecting *all* occupational pneumoconiosis claimants to the more exacting procedure and higher rebuttable standard."); *Walters v. Blair*, 462 S.E.2d 232, 234 (N.C. Ct. App. 1995), *aff'd*, 476 S.E.2d 105 (N.C. 1996) (per curiam) (striking down a statute

37

regarding disability and death benefits for silicosis or asbestosis under workers' compensation because it was "grossly underinclusive" since similar government interests would presumably be equally served by the same treatment of any number of other serious diseases).

{39}     Additionally, it is unclear why concerns regarding administrative difficulties raised by seasonal or temporary laborers should bar all farm and ranch laborers from the Act when some of those employees work year-round for the same employer.  The exclusion is, in this sense, so grossly over-inclusive as to undermine any rational relationship between the exclusion and administrative convenience.  In this case, for example, Mr. Rodriguez asserts that he worked full-time for Brand West Dairy for four years prior to his injury.  The proponents of the exclusion do not explain why his claim, or other similar claims brought by full-time farm and ranch laborers, would be more difficult to administer than a  claim brought by a full-time employee in any other industry.

{40}     In conclusion, the combined under- and over-exclusiveness of the farm and ranch laborer exclusion renders it so attenuated from the purported government interest of administrative convenience as to be arbitrary discrimination.

{41}     **Third,** Workers have demonstrated that there is neither evidence in the record

nor firm legal rationale to support a rational relationship between federal regulations of agricultural prices and differential treatment of farm and ranch laborers under the Act. To support this rationale, the Bureau cites 7 U.S.C. § 608c (2012), which sets certain minimum prices for milk and other dairy products, and 7 U.S.C. § 1421 (2012), under which the United States Secretary of Agriculture may sometimes set price supports for agricultural commodities. Notably, the provisions set *minimum prices* or price supports in excess of *minimum prices* for agricultural products. This belies any implication that federal regulations hold down the prices of agricultural commodities, because the price regulations cited by the Bureau are designed to provide special *assistance* to farmers by stabilizing markets for agricultural commodities. The Bureau also asserts that farmers are generally "price-takers," which means that they have little ability to increase prices and must generally accept prevailing market rates, and that without the exclusion, New Mexico farmers would be at a competitive disadvantage.

{42} However, only a small minority of states still allow the complete exemption of farm workers from workers' compensation. For instance, just among states bordering New Mexico, neither Arizona nor Colorado treats farm and ranch laborers differently than any other workers for purposes of workers' compensation, *see* Ariz. Rev. Stat.

Ann. §§ 23-901 to -1104 (1964, as amended through 2015); Colo. Rev. Stat. §§ 8-40-101 to -55-104 (West 1990, as amended through 2014), and Oklahoma and Utah both require limited mandatory coverage that is designed to exclude only small farms and family farms, *see* Okla. Stat. tit. 85A, § 2(18)(b) (2013) (excluding farms with an annual payroll of less than $100,000); Utah Code Ann. § 34A-2-103(5) (2016) (excluding farms with an annual payroll of less than $50,000, which does not include payroll payments to members of the families owning the small farms). However, farmers and ranchers from these neighboring states, as well as a significant minority of New Mexico farmers and ranchers who have elected to provide coverage to their workers under Section 52-1-6(B), are subject to the same price regulations and compete in the same markets as New Mexico farmers who elect not to provide coverage. Thus, Workers have met their burden.

{43}     **Fourth,** Workers have also met their burden in demonstrating that there is neither firm legal rationale nor evidence in the record to support a rational relationship between the differential classification of farm and ranch laborers under the Act and the government purpose of helping New Mexico's small, rural farms and protecting their traditions. To support this purported justification, the Bureau cites statistics which show that a great majority of New Mexico's farms are small, family-

run operations, and demonstrate that the average New Mexico farm carries a thin or negative profit margin. However, the Act is only mandatory for private employers of three or more workers, *see* § 52-1-2, and therefore the exclusion only benefits farms and ranches that employ three or more employees. According to the 2012 Census of Agriculture created by the United States Department of Agriculture, 1,864 of the 24,721 "farms" in New Mexico employ three or more workers, which means that only approximately the largest 7.5% of farms in New Mexico benefit from the exclusion. U.S. Dep't of Agriculture, 2012 Census of Agriculture: United States Summary and State Data, Vol. 1 at Tables 1 & 7 (May 2014), *available at* http://www.agcensus.usda.gov/Publications/2012/Full_Report/Volume_1,_Chapter_1_US/usv1.pdf (last reviewed June 1, 2016). Therefore, the exclusion does not even apply to approximately 92.5% of the farms in the state because they have fewer than three employees. Furthermore, the additional costs to the remaining 7.5% would be proportional to the number of employees and would not fall disproportionately on smaller operations because workers' compensation is payroll-based. Finally, the Bureau contends that the exclusion protects "the culture of 'neighboring'—in which farmers and ranchers help perform work on their neighbors' farms and ranches," which it claims "is a critical part of the culture of rural communities," and preserves

the tradition of children or other family members performing "farm and ranch duties as chores." However, volunteer or unpaid workers are generally not entitled to workers' compensation benefits, *see Jelso v. World Balloon Corp.*, 1981-NMCA-138, ¶ 31, 97 N.M. 164, 637 P.2d 846, so the practices of "neighboring" and children performing chores are not affected by the exclusion. Therefore, Workers have met their burden by demonstrating that there is no rational relationship between this government interest and the exclusion of farm and ranch laborers from the Act.

{44} **Fifth** and finally, Workers have proved that there is no legitimate government interest in subjecting only workplace injuries suffered by farm and ranch laborers to the common law tort system, while any other workplace injury suffered by an employee of an agricultural employer goes through the workers' compensation system. Because all workers subject to the Act lose any common law negligence claims that they may have had otherwise, *see* § 52-1-6(D), (E), the Bureau argues that the Legislature merely intended to preserve the availability of tort remedies for workplace injuries suffered by farm and ranch laborers. The Bureau also claims that the exclusion of farm and ranch laborers from the workers' compensation system and their employers' ability to voluntarily elect into or out of the system is beneficial to both parties. However, contrary to these assertions, the trade-off between common

law negligence claims and no-fault remedies under the Act, *see Salazar*, 2007-NMSC-019, ¶ 11, does not create equality between tort claims and workers' compensation claims or provide any reason for drawing a distinction between workplace injuries suffered by farm and ranch laborers and those suffered by any other employee of an agricultural employer. Further, it does not explain why this is a legitimate government purpose. This distinction imposes a negligence standard of fault on agricultural employers for a particular class of their employees while establishing a no-fault standard for all others. Additionally, as the parties observed at oral argument, farm and ranch laborers are engaged in a risky profession where workplace accidents frequently result from inherently unpredictable working conditions. For example, in this case, Ms. Aguirre slipped and fell in a field and Mr. Rodriguez suffered a devastating injury when he was "head-butted" by a cow. It is extremely unlikely that either of these injuries could be the basis for a common law claim since both apparently resulted from unpredictable working conditions. Workers have rightly indicated that there is neither any articulated reason for this policy nor a government interest in it.

**III. OUR HOLDING IN THIS CASE WILL APPLY ON A MODIFIED PROSPECTIVE BASIS**

{45} The UEF, Employers, and various amici urge this Court to enter a prospective

43

or modified prospective holding in this case that the exclusion is unconstitutional. Under our prospectivity analysis, we first presume that a new civil rule operates retroactively, but that presumption may then be overcome by "a sufficiently weighty combination" of the three factors described by the United States Supreme Court in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106-07 (1971), *overruled by Harper v. Va. Dep't of Taxation*, 509 U.S. 86 (1993). *Beavers v. Johnson Controls World Servs., Inc.*, 1994-NMSC-094, ¶¶ 20-22, 118 N.M. 391, 881 P.2d 1376.

{46} Under the first *Chevron* factor, we consider the degree to which our decision in this case "establish[es] a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed." *Marckstadt v. Lockheed Martin Corp.*, 2010-NMSC-001, ¶ 31, 147 N.M. 678, 228 P.3d 462 (internal quotation marks and citations omitted). Farm and ranch laborers have been explicitly excluded from the Act since 1937. *See* 1937 N.M. Laws, ch. 92, § 2. This long-standing exclusion has been consistently enforced by New Mexico appellate courts, *see Tanner*, 1995-NMCA-053, ¶ 12; *Cueto*, 1980-NMCA-036, ¶¶ 9-10; *Varela v. Mounho*, 1978-NMCA-086, ¶ 9, 92 N.M. 147, 584 P.2d 194, and our holding in this case was not clearly foreshadowed by case law or otherwise.

{47} Further, substantial reliance interests would be upset by retroactive application of our holding here. The farm and ranch laborer exclusion primarily affects contracts between employers and employees in the workplace. *See Beavers*, 1994-NMSC-094, ¶ 28 ("The reliance interest to be protected by a holding of nonretroactivity is strongest in commercial settings, in which rules of contract and property law may underlie the negotiations between or among parties to a transaction."). Also, some employers acted in reliance on the exclusion and did not purchase workers' compensation insurance; however, the ruling in this case will require them to do so and to assume various other new duties related to providing workers' compensation coverage to farm and ranch laborers. *See Lopez v. Maez*, 1982-NMSC-103, ¶ 17, 98 N.M. 625, 651 P.2d 1269 (applying new rule prospectively because it imposed a new duty and "the imposition of this new liability on tavernowners may subject [them] to liability when they are not properly insured").

{48} Additionally, we do not agree with Workers' argument that it was unreasonable and a risk for employers to continue to rely on the exclusion rather than purchasing insurance that would cover farm and ranch laborers after the district court's final judgment in *Griego* in 2012. By following this reasoning, we would effectively bind all farm and ranch employers to a single district court decision to which they were not

45

parties. *See* Rule 12-405(A)-(C) NMRA (unpublished opinions are non-precedential); NMSA 1978, § 44-6-12 (1975) (No declaratory judgment "shall prejudice the rights of persons not parties to the proceeding."). Accordingly, we hold that the first *Chevron* factor weighs heavily in favor of prospective application of our holding in this case.

{49} Under the second *Chevron* factor, we must "weigh the merits and demerits" of retroactive application "by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Marckstadt*, 2010-NMSC-001, ¶ 31 (internal quotation marks and citations omitted). Despite the equal protection interests weighing in favor of retroactivity, we weigh this factor in favor of prospective application. The numerous impracticalities a retroactive holding could create within the New Mexico workers' compensation scheme may significantly hinder the Act's purpose of creating "a quick and efficient system" of workers' compensation. *See Wagner*, 2005-NMSC-016, ¶ 25. For example, the Administration and the UEF convincingly argue that a retroactive holding would create a number of disputes regarding whether employers and workers should have complied with various mandatory provisions of the Act and as to the scope of the UEF's duties to uninsured employers. Additionally, it would

46

be contrary to the purposes of the Act to impose "quasi-criminal sanctions" on previously uninsured employers, *Wegner v. Hair Prods. of Tex.*, 2005-NMCA-043, ¶ 10, 137 N.M. 328, 110 P.3d 544, based on an obligation to provide workers' compensation insurance that originated with this case. *See* § 52-1-9.1(G)(2) (outlining a mandatory minimum 15% penalty against uninsured employers).

{50} Under the third *Chevron* factor, we must "weigh[] the inequity imposed by retroactive application" to determine whether the "decision . . . could produce substantial inequitable results if applied retroactively . . . ." *Marckstadt*, 2010-NMSC-001, ¶ 31 (internal quotation marks and citations omitted). This Court has previously recognized that "[t]he greater the extent a potential defendant can be said to have relied on the law as it stood at the time he or she acted, the more inequitable it would be to apply the new rule retroactively." *Beavers*, 1994-NMSC-094, ¶ 38. We therefore weigh the third *Chevron* factor in favor of prospective application due to the long-standing, substantial, and reasonable reliance of employers on the exclusion's validity and the inequities that would arise from the practical difficulties of retroactive application.

{51} Weighing the *Chevron* factors together, we conclude that the reliance interests of employers combined with the practical difficulties that would result from

retroactive application are sufficient to overcome our presumption of retroactivity in this case. Accordingly, we hold that the Act's farm and ranch laborer exclusion is unconstitutional and direct that our holding be prospectively applied to any injury that manifests after the date that our mandate issues in this case pursuant to Rule 12-402(B). *See Montell v. Orndorff*, 1960-NMSC-063, ¶ 9, 67 N.M. 156, 353 P.2d 680 (concluding that the "occurrence of injury" refers to "when disability appears—in other words, when the injury . . . becomes manifest." (internal quotation marks and citation omitted)); *De La Torre v. Kennecott Copper Corp.*, 1976-NMCA-108, ¶¶ 18-19, 89 N.M. 683, 556 P.2d 839 (clarifying that the version of workers' compensation law applicable to a claim is the law as of the date when the compensable disability should have been reasonably apparent to the worker). Further, we modify our prospective holding by applying it to the litigants in this case, Ms. Aguirre and Mr. Rodriguez, "for having afforded us the opportunity to change an outmoded and unjust rule of law." *Lopez*, 1982-NMSC-103, ¶ 18.

## IV.   CONCLUSION

{52}   We remand these consolidated cases to their respective WCJs for resolution without reliance on the farm and ranch laborer exclusion in Section 52-1-6(A). We also order that the Court of Appeals' opinion in *Rodriguez v. Brand West Dairy*,

48

2015-NMCA-097 be republished.  Because of our disposition and its prospective application, Respondents' motion for leave to file a reply dated April 13, 2016 and any other outstanding motions in the two consolidated cases before this Court are denied.

{53}     **IT IS SO ORDERED.**


_____
                                        **EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**


_____
**CHARLES W. DANIELS, Chief Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**BARBARA J. VIGIL, Justice**

**JUDITH K. NAKAMURA, Justice, dissenting**

49

**Nakamura, J. (dissenting).**

{54} Since 1917, when the Workers' Compensation Act (WCA), NMSA 1978, §§ 52-1-1 to -70 (1917, as amended through 2015), was originally enacted, the Legislature has allowed employers of farm and ranch laborers to decide for themselves whether to participate in the workers' compensation scheme. *See* NMSA 1978, § 52-1-6(A)-(B) (1990); Laws 1917, ch. 83 §§ 2, 10. For nearly 100 years, the Legislature has maintained its view that the best policy for New Mexico is that each farm and ranch employing more than three workers decides for itself whether to incur the costs of workers' compensation or to face the costs of potential tort liability. To that end, Section 52-1-6(A) excludes *employers* of farm and ranch laborers from the Legislature's requirement subjecting employers of three or more workers to the provisions of the WCA.

{55} Today, the majority opinion exercises this Court's power of judicial review and holds that this 99-year-old statutory scheme violates the New Mexico Constitution. By invalidating Section 52-1-6(A)'s exclusion of farms and ranches from mandatory participation in the state workers' compensation scheme, the majority opinion has supplanted the Legislature's view of what, all things considered, is best for New Mexico. But this Court has neither the necessary facts nor the institutional mission

50

to substitute our judgment for that of the Legislature regarding what is best for any particular industry within the State's economy.

{56}    The farm-and-ranch exclusion may be perceived as unfair, unwise, or improvident in its treatment of laborers who work for farms and ranches electing exemption from the WCA, but this Court may exercise its greatest power to invalidate a statute only if the statute contravenes the federal Constitution or the New Mexico Constitution. This case raises no federal claim, and, under well-established law, the Legislature's decision to allow employers of farm and ranch laborers to decide for themselves whether to be subject to the WCA or to face tort liability does not violate any right guaranteed by the New Mexico Constitution. Because Section 52-1-6 is socioeconomic legislation, the Worker-Respondents have a right against the disparate treatment allowed by this statute only if the statute does not rationally further a legitimate legislative purpose. The Worker-Respondents simply cannot make that showing. By enacting Section 52-1-6, the Legislature designed a statutory scheme that rationally controls costs for New Mexico farms and ranches. The statute creates a choice which allows these employers to elect the option that entails the lowest expected costs, and 29% of New Mexico farms and ranches (including many of the largest agricultural firms in the State) have elected to provide workers' compensation.

51

This statute survives an equal protection challenge. Additionally, by nullifying the Legislature's statutory scheme, the majority opinion threatens to detrimentally impact small, economically fragile farms in New Mexico. Therefore, I respectfully dissent.

# I. SECTION 52-1-6(A) IS CONSTITUTIONAL

{57} This is not a complex case. Noe Rodriguez and Maria Aguirre were injured on the job. Rodriguez and Aguirre were employed by a ranch and a farm, respectively, that had elected not to provide workers' compensation benefits and which, under Section 52-1-6(A), were not required to do so. Rodriguez and Aguirre claim that the Legislature's exclusion of employers of farm and ranch laborers from mandatory participation in the workers' compensation scheme violates their rights to equal protection under Article II, Section 18 of the New Mexico Constitution.

{58} Equal protection doctrine requires that Rodriguez and Aguirre "first prove that they are similarly situated to another group but are treated dissimilarly." *Breen v. Carlsbad Mun. Sch.*, 2005-NMSC-028, ¶ 8, 138 N.M. 331, 120 P.3d 413. That showing is easily met. Rodriguez and Aguirre are similar to all other workers in New Mexico who suffer work-related injuries and are in need of benefits. But Aguirre's and Rodriguez's employers elected exemption from the WCA, and, therefore, Aguirre and Rodriguez are treated dissimilarly from other workers whose employers

52

participate in the workers' compensation scheme. Whereas injured workers in the latter group receive workers' compensation benefits, injured workers in the former group do not, even though they may seek other forms of recovery such as damages in tort. Thus, Section 52-1-6(A) results in dissimilar treatment of workers injured on the job.

{59}    Upon a showing of dissimilar treatment, this Court determines what level of scrutiny applies to the challenged legislation. *Breen*, 2005-NMSC-028, ¶ 8. Section 52-1-6(A) is economic legislation that does not subject a suspect or sensitive class to different treatment, and, therefore, rational basis review applies. *See Griego v. Oliver*, 2014-NMSC-003, ¶ 39, 316 P.3d 865; *Wagner v. AGW Consultants*, 2005-NMSC-016, ¶ 12, 137 N.M. 734, 114 P.3d 1050 ("Ordinarily we defer to the Legislature's judgment in enacting social and economic legislation such as the WCA."). Rational basis review is the most deferential standard that a court applies when reviewing the constitutionality of legislation, "and the burden is on the party challenging the legislation to prove that it 'is not rationally related to a legitimate government[al] purpose.'" *Breen*, 2005-NMSC-028, ¶ 11 (alteration in original) (quoting *Wagner*, 2005-NMSC-016, ¶¶ 12, 24). Under rational basis review, our task is to decide, first, whether the Legislature enacted a statute to further a permissible

53

legislative purpose and, second, whether the challenged statutory provision is rationally related to that purpose. *Kane v. City of Albuquerque*, 2015-NMSC-027, ¶¶ 17-22, 358 P.3d 249.

{60} In considering the Legislature's purpose when enacting and maintaining Section 52-1-6(A)'s farm-and-ranch exclusion, the record evidence and legislative history indicate that the Legislature was motivated to contain regulatory costs incurred by economically precarious farms and ranches in New Mexico. For instance, in 2009, the Legislature considered bills that would have removed the WCA's exclusion for employers of farm and ranch laborers. *See* H.B. 62, 49th Leg., Reg. Sess. (N.M. 2009); S.B. 9, 49th Leg., Reg. Sess. (N.M. 2009). In considering these bills, the Legislature had available the Fiscal Impact Report (FIR) for House Bill 62. Members of the House Business and Industry Committee relied on the FIR in rejecting House Bill 62 by a vote of 10-2.

{61} According to the FIR for House Bill 62, the "N.M. Department of Agriculture stated the proposed legislation would introduce a significant financial strain on the farming and ranching part of the industry." FIR for H.B. 62, at 3 (Feb. 05, 2009) (2009 FIR). The FIR also included cost projections to farm and ranch employers submitted by the Workers' Compensation Administration, the National Council of

54

Compensation Insurance (NCCI), and New Mexico State University agricultural economists. *See id.* The Workers' Compensation Administration had projected the annual cost of the bill "to farm and ranch employers to be an additional $10.5 million annually. . . [which] represents a cost increase of approximately 1.5 percent." *Id.* The NCCI had similarly estimated that House Bill 62 "would increase New Mexico payroll costs by 0.4 percent and increase premiums up to 1.1 percent." *Id.* The FIR additionally indicated that, according to Workers' Compensation Administration data, the average cost per claim was approximately $16,876. *Id.* In contrast, the FIR reported that the average net income per farm in the 2002 census of agriculture was $19,373—only slightly more than the average cost per workers' compensation claim. *Id.* Indeed, in 2012, the average net cash income from farming operations in New Mexico was only $9,501. *See* United States Department of Agriculture, National Agricultural Statistics Service, 2015 State Agricultural Overview New Mexico, http://tinyurl.com/jjpx7ch (last viewed June 28, 2016). Therefore, legislative facts demonstrate a legislative concern to maintain Section 52-1-6(A) in order to contain costs incurred by fiscally vulnerable farms and ranches. *See Oliver*, 2014-NMSC-003, ¶ 47 n. 7 ("[T]his Court . . . may take judicial notice of legislative facts by resorting to whatever materials it may have at its disposal establishing or tending to

55

establish those facts." (alteration in original) (internal quotation marks and citation omitted)).

{62} Under rational basis review, the Legislature's purpose to safeguard farms and ranches in New Mexico from the imposition of additional overhead costs is permissible. There can be no dispute that the Legislature may pursue the legitimate purpose to protect certain industries from additional costs or to lower overhead costs. *See, e.g.*, *Garcia v. La Farge*, 1995-NMSC-019, ¶ 24, 119 N.M. 532, 893 P.2d 428 (finding under rational basis review that lowering the costs of malpractice insurance for health care providers was a legitimate legislative purpose); *Schirmer v. Homestake Min. Co.*, 1994-NMSC-095, ¶ 8, 118 N.M. 420, 882 P.2d 11 ("[T]he legislative goal of maintaining reasonable costs to employers is a legitimate legislative goal . . . ."); *Marrujo v. N.M. State Highway Transp. Dep't*, 1994-NMSC-116, ¶ 23, 118 N.M. 753, 887 P.2d 747 (finding under rational basis review that the reduction of costs to local governments is a valid legislative goal); *Terry v. N.M. State Highway Comm'n*, 1982-NMSC-047, ¶ 8, 98 N.M. 119, 645 P.2d 1377 (citing *Howell v. Burk*, 1977-NMCA-077, ¶ 8, 90 N.M. 688, 568 P.2d 214 (upholding a statute as rationally related to the permissible legislative goal of guarding against the imposition of costs on firms in the construction industry)). The majority opinion does not suggest otherwise.

56

{63}    The only remaining question, then, is whether Section 52-1-6(A) is rationally related to the legitimate purpose of insulating New Mexico farms and ranches from additional costs. It is. Section 52-1-6(A), in conjunction with Subsection (B), creates an architecture by which employers in the agricultural industry choose which costs they incur. There are costs involved with being subject to the WCA. Those costs include insurance premiums and fees collected pursuant to NMSA 1978, § 52-5-19 (2004). Yet, despite these costs, there are good reasons why a farm or ranch would voluntarily elect to be subject to the WCA, as permitted by Section 52-1-6(B). The WCA provides a predictable schedule of benefits and makes those benefits the exclusive remedy for an injured worker. As the record in this case reflects, "[t]here is a benefit to having insurance in place to take care of the injured worker and it might be an incentive to get a higher quality worker if they are aware of the benefits. Employers are no longer exposed to possible tort lawsuits." *Griego v. N.M. Workers' Comp. Admin.*, No. CV 2009-10130, 20, ¶ 141 (N.M. 2nd Jud. D., Oct. 17, 2011) (final pretrial order).[4] Likewise, there are risks associated with a farm or ranch's decision to forego WCA participation: such employers risk the possibility of

---

[1]As the majority opinion notes, materials related to *Griego v. New Mexico Workers' Compensation Administration* were attached by Aguirre before the Workers' Compensation Judge and accordingly form a part of the record in this case. *See* Maj. Op., ¶ 4.

unpredictable tort judgments and other costs associated with employee injury.

{64}     In other words, Subsections (A) and (B) allocate to each farm and ranch the choice whether to pay the costs of being subject to the WCA *or* to face potential tort liability.  The Legislature's allocation of this choice to each farm and ranch is rationally related to its goal to contain the costs for the farming and ranching industry because each farm and ranch is in the best position to know whether it would be more cost-effective to participate in the workers' compensation scheme or to incur the risk of tort liability and associated litigation costs.  New Mexico farms and ranches that employ more than three employees vary greatly in the number of employees hired, the positions hired for, other fixed and marginal costs, products produced, annual sales, and profitability.  *See, e.g.*, United States Department of Agriculture, National Agricultural Statistics Service, 2015 State Agricultural Overview New Mexico, http://tinyurl.com/jjpx7ch (last viewed June 28, 2016); *see also* 2014 New Mexico Agricultural Statistics Bulletin, 18, http://tinyurl.com/zahewua (last viewed June 28, 2016).  Because of that variety, it is far from arbitrary for the Legislature to allow each farm and ranch to decide for itself whether to pay the costs of the WCA or to risk tort liability.  Each farm and ranch will very likely elect the option that entails the lowest expected costs, thereby furthering the Legislature's legitimate goal to support

New Mexico's economically precarious farms and ranches.

{65} In fact, the record demonstrates that 29% of farms and ranches that employ more than three workers have voluntarily elected to be subject to the WCA. This Court heard at oral argument that, of the farms and ranches who have elected to participate in the WCA, the majority are the largest agribusinesses who hire the largest number and largest variety of workers. It comes as no surprise that larger firms in New Mexico's farming and ranching industry have decided that it is best for their businesses to be subject to the WCA. By doing so, these businesses fix costs and eliminate exposure to unpredictable tort liability. Conversely, the smaller farms and ranches have decided that, given their smaller economies of scale and smaller profit margins, it is best for their businesses to avoid the costs (and forgo the benefits) of the WCA and to risk tort liability instead. So, while the majority opinion may purport to correct a power disparity between workers and the largest firms in the agricultural industry, its decision will likely have the effect of raising costs for the most economically precarious, smaller New Mexico farms and ranches. By protecting against such circumstance, Section 52-1-6(A) rationally furthers the legitimate legislative purpose.

## II. THE MAJORITY OPINION ERRS IN CONCLUDING THAT SECTION 52-1-6(A) IS UNCONSTITUTIONAL

{66}   The majority opinion asserts that it "remain[s] highly deferential to the Legislature by presuming the constitutionality of social and economic legislation." Maj. Op. ¶ 27. But it is difficult to see how. Instead of interpreting Section 52-1-6 according to its plain language and then employing the traditional doctrine of rational basis review, the majority opinion does something quite different. First, the majority opinion misinterprets Section 52-1-6 to create a distinction that the Legislature neither drew nor intended. Maj. Op. ¶¶ 15-20. The majority opinion then misapplies rational basis scrutiny to hold Section 52-1-6(A) unconstitutional and relies on inapposite case law to support that holding. Maj. Op. ¶¶ 28-33. Such analysis is neither deferential to the Legislature nor willing to presume the constitutionality of social and economic legislation. And the majority opinion departs from the reasoning and the traditional equal protection analysis employed by myriad other state appellate courts and the United States Supreme Court to uphold analogous farm-and-ranch exceptions to mandatory workers' compensation statutes against identical state and federal constitutional challenges.[5]

---

[2]*See, e.g.*, *Collins v. Day*, 644 N.E.2d 72, 82 (Ind. 1994) (holding that exemption for agricultural employers and employees from mandatory workers' compensation coverage did not violate the equal privileges and immunities guarantee of the state constitution); *Haney v. N.D. Workers Comp. Bureau*, 518 N.W.2d 195, 202 (N.D. 1994) (holding that statutory provision excluding agricultural employees

60

from mandatory workers' compensation coverage did not violate state equal protection guarantee); *Baskin v. State ex rel. Worker's Comp. Div.*, 722 P.2d 151, 156 (Wyo. 1986) (holding "exception of 'ranching and agriculture' from extra-hazardous occupations of teaming and truck driving and motor delivery" subject to mandatory workers compensation' coverage did not violate state or federal equal protection guarantees); *Eastway v. Eisenga*, 362 N.W.2d 684, 689 (Mich. 1984) (holding that exemption for some agricultural employers from mandatory participation in workers' compensation scheme did not violate either federal or state equal protection guarantees); *Ross v. Ross*, 308 N.W.2d 50, 53 (Iowa 1981) (rejecting federal equal protection challenge to statute exempting employers of familial farmworkers from compulsory participation in workers' compensation scheme); *Otto v. Hahn*, 306 N.W.2d 587, 592 (Neb. 1981) (rejecting federal equal protection challenge to statute excluding employers of farmworkers from mandatory participation in workers' compensation scheme); *Fitzpatrick v. Crestfield Farm, Inc.*, 582 S.W.2d 44, 45 (Ky. App. 1978) (holding that exemption for employers "engaged solely in agriculture" from mandatory participation in workers' compensation scheme did not violate state or federal equal protection guarantees); *Anaya v. Indus. Comm'n*, 512 P.2d 625, 626 (Colo. 1973) (holding that the "exclusion of farm and ranch labor" from mandatory workers' compensation benefits did not violate equal protection (citing *Romero v. Hodgson*, 319 F. Supp. 1201, 1203 (N.D. Cal. 1970) (per curiam, three-judge court), *aff'd* 403 U.S. 901 (1971) (holding that exclusion of agricultural labor from the definition of employment in both California and federal unemployment compensation statutes did not violate the federal equal protection guarantee)); *State ex rel. Hammond v. Hager*, 563 P.2d 52, 57 (Mont. 1972) (holding that exclusion for "employers engaged in farming and stock raising" from workers' compensation scheme did not violate the federal equal protection guarantee); *Sayles v. Foley*, 96 A. 340, 344 (R.I. 1916) (holding that exclusion for farm laborers and other laborers involved in agricultural pursuits from state workers' compensation scheme did not violate state or federal constitutions); *Hunter v. Colfax Consol. Coal Co.*, 154 N.W. 1037, 1052-53 (Iowa 1915) (same); *In re Opinion of Justices*, 96 N.E. 308, 315 (Mass. 1911) (concluding that exclusion of farm laborers from provision of workers' compensation act provision modifying common law defenses to common law negligence claims did not violate the federal constitution); *see also Middleton v. Tex. Power & Light Co.*, 249 U.S. 152, 162 (1918) (concluding that Texas Employer's Liability Act's exclusion from mandatory insurance coverage for injuries sustained

**A.** **The majority opinion misinterprets Section 52-1-6 in concluding that the statute is unconstitutional**

{67} This Court may not interpret a statute in ways that render it constitutionally infirm. *See, e.g.*, *State v. Flores*, 2004-NMSC-021, ¶ 16, 135 N.M. 759, 93 P.3d 1264 ("When construing a statute we are to construe it, if possible, so that it will be constitutional." (internal quotation marks and citation omitted)); *accord Huey v. Lente*, 1973-NMSC-098, ¶ 6, 85 N.M. 597, 514 P.2d 1093 ("[I]f a statute is susceptible to two constructions, one supporting it and the other rendering it void, a court should adopt the construction which will uphold its constitutionality."). Yet, that is what the majority opinion has done.

{68} According to the majority opinion, Section 52-1-6(A) draws a line between, on the one hand, "farm and ranch laborers," and, on the other hand, all other employees of farms and ranches. Maj. Op. ¶¶ 15-20. Not every employee of a farm or ranch is a "farm and ranch laborer." Some larger farms and ranches also hire, for example, staff who work primarily in the packaging of crops, sales, and administration. The majority opinion interprets Section 52-1-6(A) to allow farms and ranches to exclude

by, inter alia, farm laborers did not violate the federal equal protection guarantee); *New York Central R.R. Co. v. White*, 243 U.S. 188, 208 (1916) (concluding that the exclusion of farm laborers from New York workers' compensation scheme did not violate the federal equal protection guarantee).

62

"farm and ranch laborers" from workers' compensation, but not other employees, such as administrative or sales staff. Maj. Op. ¶¶ 15-20. The majority opinion concludes that distinction is irrational and, therefore, holds that Section 52-1-6(A) violates the New Mexico Constitution. Maj. Op. ¶¶ 28-33.

{69} Irrespective of whether it would be irrational for the Legislature to allow farms and ranches to exclude "farm and ranch laborers" from workers' compensation while not permitting farms and ranches to exclude other employees, this is *not* a distinction that the Legislature drew. The distinction that the majority opinion focuses on is simply not in the statute. "The text of a statute or rule is the primary, essential source of its meaning." NMSA 1978, § 12-2A-19 (1997). And the text of Section 52-1-6(A) does not remotely suggest that the Legislature intended to permit farms and ranches to exclude laborers who primarily work with the crops and livestock, but not other employees.

{70} Rather, Section 52-1-6(A) indicates that the Legislature permits farms and ranches to exclude *themselves* from mandatory participation in the workers' compensation scheme. The statute unambiguously provides an exemption for *employers*, not certain subsets of their employees. Section 52-1-6 plainly states that "[t]he provision of the [WCA] . . . shall not apply to *employers* of . . . farm and ranch

63

laborers." § 52-1-6(A). The statute also says "*employers* of . . . farm and ranch laborers" can make "[a]n election to be subject to the [WCA]." § 52-1-6(B). Accordingly, the statute's exclusion from mandatory participation in the workers' compensation scheme applies to *employers*, and the choice to participate also resides with *employers*. *See* § 52-1-6(A)-(B).

{71} Instead of following the plain text of the statute, the majority opinion adopts an erroneous reading offered by the Court of Appeals in *Cueto v. Stahmann Farms, Inc.*, 1980-NMCA-036, 94 N.M. 223, 608 P.2d 535, and *Holguin v. Billy the Kid Produce, Inc.*, 1990-NMCA-073, 100 N.M. 287, 795 P.2d 92. *See* Maj. Op. ¶¶ 15-18. *Cueto* and *Holguin* read Section 52-1-6(A)'s exclusion to turn, not on the business of the employer, but rather on the primary job duties of the employee. *See Holguin*, 1990-NMCA-073, ¶ 19; *Cueto*, 1980-NMCA-036, ¶ 6. The majority opinion reasons that Section 52-1-6(A) must mean something other than what it says because a "'literal interpretation'" of the statute would lead to "'absurd results.'" Maj. Op. ¶ 15 (quoting *Cueto*, 1980-NMCA-036, ¶ 6). According to the majority opinion, a literal reading of the text would allow any employer—despite the industry in which it operates—to exclude its entire workforce from workers' compensation coverage simply by hiring a couple of farm or ranch laborers. Maj. Op. ¶ 15. Imagine, for

64

example, a semiconductor chip manufacturing facility planting an adjacent pecan orchard. No court in New Mexico could reasonably interpret Section 52-1-6(A) to provide that such a factory could exclude itself from the provisions of the WCA. But a court need not interpret the statute as the majority opinion does in order to deny the hypothetical factory the benefit of the farm-and-ranch exclusion.

{72}     Contrary to the majority opinion's suggestion, its interpretation of Section 52-1-6(A) is not the only interpretation that avoids the absurd result. Section 52-1-6(A) should be read not as allowing the exclusion of only farm and ranch laborers from the mandatory provisions of the WCA, but rather as allowing the exclusion of *employers* whose workforce is *mainly comprised* of farm and ranch laborers. In other words, if an *employer* mainly employs farm and ranch laborers (i.e., if an employer *is* a farm or a ranch), then under Subsections (A) and (B), that *employer* is not required to participate in the workers' compensation scheme, although it may voluntarily elect to do so.

{73}     Not only is this interpretation available to avoid the absurd result the majority opinion envisions, it also reflects this Court's precedent. This Court has previously determined that the farm-and-ranch exclusion protects a farmer or rancher against workers' compensation claims brought by employees who are not farm and ranch

65

laborers. *See Williams v. Cooper*, 1953-NMSC-050, ¶¶ 10-13, 57 N.M. 373, 258 P.2d 1139. In *Williams*, this Court reversed an award of workers' compensation because the statute excluded the workers' compensation claim of an employee who was injured while constructing an addition to a dance hall that a rancher operated. 1953-NMSC-050, ¶¶ 10-13. This Court emphasized "'the fact that it is not the nature of the particular work in which the employee is engaged at the time of his injury *but rather the character of his employer's occupation which controls . . . .'*" *Id.* ¶ 7 (emphasis added) (quoting *Rumley v. Middle Rio Grande Conservancy Dist.*, 1936-NMSC-023, ¶ 16, 40 N.M. 183, 57 P.2d 283). Accordingly, this Court held that "the occupation or pursuit of the defendant [which was ranching] did not subject him to liability under the act, even if at the moment the [non-ranching] work being done by the [non-ranch-laborer] plaintiff with a different factual background would have rendered his injury compensable [i.e. had the plaintiff worked for a non-rancher]." *Id.* ¶ 10. *Williams* is guiding precedent regarding the interpretation of the farm-and-ranch exclusion, yet the majority opinion avoids it.

{74} Based on the text of the statute and our own precedent, this Court is compelled to read Section 52-1-6(A) as allowing the exclusion, not of farm and ranch laborers themselves, but of *employers* whose workforce is mainly comprised of farm and ranch

66

laborers. This interpretation faithfully adheres to the text of Section 52-1-6(A). It effectuates the Legislature's purpose to contain costs incurred by New Mexico's farms and ranches. It avoids the absurd result of permitting any employer from excluding itself from the provisions of the WCA by hiring a few farm or ranch laborers. It follows this Court's previous readings of the statute. *See Williams*, 1953-NMSC-050, ¶ 10. And, most importantly, it does not create a constitutionally infirm distinction. *See Huey*, 1973-NMSC-098, ¶ 6 ("[I]f a statute is susceptible to two constructions, . . . a court should adopt the construction which will uphold its constitutionality.").

{75} Yet, for unconvincing reasons, the majority opinion adopts an alternative reading. First, the majority opinion relies on *Griego v. Oliver* to support its view that, contrary to the plain text of the statute, it may nevertheless adopt *Cueto*'s dubious interpretation in order to hold the statute unconstitutional. Maj. Op. ¶ 19 (citing *Oliver*, 2014-NMSC-003, ¶ 24). But *Oliver* is inapposite. The marriage statutes under review in *Oliver* could not be interpreted to authorize marriage between same-gender couples, which would have saved the statutes from constitutional challenge. *See Oliver*, 2014-NMSC-003, ¶¶ 19-24. By contrast, the plain text of Section 52-1-6(A) and this Court's precedents support an interpretation that not only materially

differs from the interpretation reached by *Cueto* and adopted by the majority opinion but which also saves Section 52-1-6(A) from the constitutional challenge at issue.

{76} Second, the majority opinion's reliance on *Koger v. A.T. Woods, Inc.* is misplaced. *See* Maj. Op. ¶ 20 (citing 1934-NMSC-020, ¶¶ 17-20, 38 N.M. 241, 31 P.2d 255). While *Koger* seemed to apply the exclusion based upon "the general nature of the object of employment [of the employee]," 1934-NMSC-020, ¶ 17, after *Koger* was decided, the Legislature amended the WCA to create an explicit exclusion for "*employers* . . . of farm and ranch laborers." Laws 1937, ch. 92, § 2 (emphasis added). Looking to *that* statute, this Court in *Williams* focused not on the employee's primary job duties, nor on the particular work the employee was engaged in when injured, but rather expressly said that it is "*the character of his employer's occupation which controls . . . .*" 1953-NMSC-050, ¶ 7 (emphasis added) (internal quotation marks and citation omitted). On that basis, this Court reversed an award of workers' compensation benefits. *Id.* ¶ 13.

{77} Third, the majority opinion erroneously grounds its interpretation on legislative silence. *See* Maj. Op. ¶ 20. Notwithstanding this Court's own precedent, the majority opinion notes that the *Cueto* Court of Appeals interpreted Section 52-1-6(A) to allow the exclusion of only farm and ranch laborers from workers' compensation coverage.

68

The majority opinion then reasons that, because the Legislature did not subsequently amend the statute, the Legislature therefore intended a meaning different than what the text of the statute expressly provides. Maj. Op. ¶ 20 (citing *Cueto*, 1980-NMCA-036, ¶¶ 6-7). This reasoning is unpersuasive.

{78}     Inferences based on the Legislature's silence subsequent to a court's decision are an exceptionally weak method of statutory interpretation. *See Zuber v. Allen*, 396 U.S. 168, 185 (1969) ("Legislative silence is a poor beacon to follow in discerning the proper statutory route."); Norman J. Singer and J.D. Shambie Singer, 2B Sutherland Statutory Construction § 49.9, at 124 (7th ed. 2012) (noting that legislative silence is "a weak reed upon which to lean" (internal quotation marks omitted)). Legislative silence is consistent with any number of judicial interpretations, no matter how erroneous. Further, the use of legislative silence as a method of statutory interpretation in this case is inappropriate. When the text of a statute is clear and unambiguous, as here, this Court gives effect to the text and refrains from further statutory interpretation. *See, e.g.*, *State v. Rivera*, 2004-NMSC-001, ¶ 10, 134 N.M. 768, 82 P.3d 939.

{79}     Even if it were sound to interpret Section 52-1-6(A) by drawing conclusions from the Legislature's silence following *Cueto*, this is not a case where silence speaks

volumes. In *Cueto*, the Court of Appeals *enforced* Section 52-1-6(A)'s exclusion, denying that a farmworker had a cause of action for workers' compensation. *Cueto*, 1980-NMCA-036, ¶ 9. The Court of Appeals also summarily *rejected* the claim that the exclusion violated equal protection. *Cueto*, 1980-NMCA-036, ¶ 8 (citing *Espanola Hous. Auth. v. Atencio*, 1977-NMSC-074, 90 N.M. 787, 568 P.2d 1233). Given that the Court of Appeals not only properly rejected a workers' compensation claim but also upheld the statute from an equal protection challenge, it is uncertain why the Legislature would have felt pressed to clarify its already unambiguous exclusion for *employers* of farm and ranch laborers.

**B.      The majority opinion relies on inapposite if not questionable case law to conclude that the Legislature acted arbitrarily**

{80}    Based on its interpretation of Section 52-1-6(A), the majority opinion concludes that the Legislature cannot allow farms and ranches to exclude farm and ranch laborers from workers' compensation coverage while at the same time requiring farms and ranches to provide coverage for those employees who are not farm and ranch laborers (such as administrative staff). Maj. Op. ¶¶ 31-35. The majority opinion reasons that such an instance of line drawing, which it incorrectly imputes to the Legislature, would *arbitrarily* further the permissible legislative goal of containing costs for New Mexico farms and ranches. Maj. Op. ¶¶ 32-35. And the

majority opinion reaons that such arbitrariness in serving the goal of cost containment renders Section 52-1-6(A) unconstitutional.  Maj. Op. ¶¶ 32-35.

{81}     Assuming *arguendo* that Section 52-1-6(A) means what the majority opinion reads it to mean and that the Legislature allocated a choice to farms and ranches *only* with respect to their laborers, the statute is still not unconstitutional.  This Court has already deferred to similar instances of legislative line-drawing with respect to the farm-and-ranch exclusion.  In *Williams*, which  rejected the workers' compensation claim of a non-ranch laborer injured while performing non-ranch work for a rancher, this Court recognized that it was bound to defer to the Legislature's policy, even as we perceived that the line drawing was harsh.  1953-NMSC-050, ¶ 7.

{82}     What legal basis does the majority opinion have for taking the opposite approach?  The majority opinion cites a single New Mexico case to support its view that the Legislature could not draw the line which the majority imputes to it: *Schirmer v. Homestake Mining Co.  See* Maj. Op. ¶ 33 (citing *Schirmer*, 1994-NMSC-095, ¶¶ 9-10).  *Schirmer* held that a ten-year statute of repose that extinguished employees' claims for injuries resulting from occupational exposure to radioactive materials violated equal protection because the statute was arbitrarily related to "the valid legislative goal of lowering employer costs."  1994-NMSC-095, ¶ 9.  Some injuries

caused by the occupational exposure to radiation, the *Schirmer* Court reasoned, were equally deserving of recovery even though they develop and accrue after the ten-year repose date. *Id.* Because of *Schirmer*, the majority opinion concludes that the Legislature, to lower costs to farms and ranches, could not allow farms and ranches to exclude the claims of only farm and ranch laborers. Maj. Op. ¶ 33.

{83} But *Schirmer* was almost certainly incorrect when decided. *See Coleman v. United Eng'rs & Constructors, Inc.*, 1994-NMSC-074, ¶ 10, 118 N.M. 47, 878 P.2d 996 (upholding a 10-year statute of repose from an equal-protection challenge); *Terry*, 1982-NMSC-047, ¶ 8 (same). Even if *Schirmer* were not incorrectly decided, the persuasiveness of its holding is wholly eroded by *Garcia*, 1995-NMSC-019, ¶¶ 17-18 (upholding the Medical Malpractice Act's *three-year* statute of repose from an equal protection challenge).

{84} In any event, *Schirmer* is distinguishable. Even if the Legislature drew a line between farm and ranch laborers who may be excluded from mandatory workers' compensation and other agribusiness employees for whom coverage is required, that distinction would not be arbitrary in the same way that the 10-year repose statute in *Schirmer* is arbitrary. Section 52-1-6(A), unlike any statute of repose, does not itself necessarily bar some set of claims. In fact, Section 52-1-6(A) does not necessarily

bar any claim. Rather, the statute allows, and has always allowed, each farm and ranch in New Mexico to decide for itself whether to provide workers' compensation coverage for its employees who are farm and ranch laborers.

{85} Further, the distinction that the majority opinion imputes to the Legislature is not arbitrarily related to the permissible legislative goal of containing costs for farms and ranches. Unlike the largest firms in agribusiness, not every farm or ranch in New Mexico employs a variety of workers. Many smaller farms and ranches in our State may only employ workers who could only be classified as "farm or ranch laborers." To contain costs for those smaller operations, the Legislature may permissibly allow each farm and ranch to choose whether to participate in the workers' compensation scheme. Again, because of the great diversity of farms and ranches operating in New Mexico's agricultural industry, and because each is best positioned to know its cost structure and its tolerance for the risk of tort liability, the Legislature's putative allocation of the choice to each farm and ranch to provide workers' compensation coverage only for its farm and ranch laborers would advance its goal to aid New Mexico farms and ranches in a rational and efficient way. I repeat: 29% of New Mexico's farms and ranches have elected to be subject to the WCA; 71% have not. As this Court heard at oral argument, the majority of the 29% of farms that have

73

elected to be subject to the WCA are large operations. The Legislature's decision to allocate a choice to farms to be subject to the WCA reflects "substantial and real distinction[s]" between the farms and ranches who choose to provide workers' compensation coverage and those that do not. *Schirmer*, 1994-NMSC-095, ¶ 9. Those real and substantial distinctions track whether the farm is relatively large or small.

{86}    Therefore, *Schirmer*, even if it were not bad law, is so distinguishable as to provide no support for the majority opinion's conclusion. The majority opinion treats Section 52-1-6(A) as though it furthered cost savings for farms and ranches by, for example, necessarily excluding workers' compensation claims of left-handed farm and ranch laborers. But the legislation under review is nothing like that. The arbitrariness that the majority opinion perceives is simply not present either in the interpretation that the majority opinion imputes to the Legislature or in the statutory scheme that the Legislature actually enacted.

**C.    The majority opinion's application of a more stringent version of rational basis review confuses equal protection doctrine**

{87}    Lastly, I disagree with the majority opinion's application of the so-called "modern articulation" of the rational basis test that this Court first referenced in *Trujillo v. City of Albuquerque*. *See* 1998-NMSC-031, ¶ 32, 125 N.M. 721, 965 P.2d

74

305 (overruling, yet "subsuming" a heightened, less deferential form of rational basis analysis applied in *Alvarez v. Chavez*, 1994-NMCA-133, ¶¶ 16-23, 118 N.M. 732, 886 P.2d 461, and *Corn v. N.M. Educators Fed. Credit Union*, 1994-NMCA-161, ¶¶ 9-14, 119 N.M. 199, 889 P.2d 234). In *Wagner*, this Court explained that under the heightened form of rational basis review the party challenging a statute must show that it is not rationally related to a legitimate governmental purpose by "demonstrat[ing] that the classification created by the legislation is not supported by a 'firm legal rationale' or evidence in the record.'" 2005-NMSC-016, ¶ 24 (quoting *Corn*, 1994-NMCA-161, ¶ 14). *Wagner* did not apply the heightened standard to invalidate legislation; instead, *Wagner* upheld the WCA's attorney fee limitation from an equal protection challenge. 2005-NMSC-016, ¶ 32. Nevertheless, *Wagner*'s dicta regarding the emergence of a heightened form of rational basis review prompted a member of this Court to write separately. *See* 2005-NMSC-016, ¶¶ 37-40 (Bosson, C.J., concurring in part and dissenting in part). Justice Bosson noted that the *Wagner* majority failed to explain this "modern articulation" and, moreover, that the *Wagner* majority's departure from traditional rational basis review was neither desirable nor appropriate. *Id.*

{88} After *Wagner*, the "modern articulation" of rational basis review was buried

for some years. Since that decision, this Court has employed rational basis review without reference to this heightened standard both in analyzing federal *and* state constitutional claims. *See Kane*, 2015-NMSC-027, ¶¶ 17-22 (analyzing a First Amendment challenge and concluding that the City of Albuquerque's regulations prohibiting city employees from holding elective office "are rationally related to legitimate government purposes"); *State v. Tafoya*, 2010-NMSC-019, ¶ 26, 148 N.M. 391, 237 P.3d 693 (analyzing state and federal equal protection challenges and holding that a sentencing court's discretion to award good time credit eligibility "is rationally related to the goals of punishment as well as rehabilitation"). This Court even explained New Mexico's equal protection doctrine in detail and described rational basis review in its traditional form without so much as mentioning the so-called "modern articulation." *See Oliver*, 2014-NMSC-003, ¶ 39. Also, in *Morris v. Brandenburg*, 2016-NMSC-___, ¶ 56, ___ P.3d ___, this Court determined that NMSA 1978, Section 30-2-4, which makes it a crime to deliberately aid another in the taking of his or her own life, satisfied rational basis review because the statute rationally served legitimate state interests that this Court deemed to be "firm legal rationale[s];" however, the *Morris* Court merely repeated this talisman, again without explaining when a statute is, in fact, supported by a "firm legal rationale" (as opposed to any

conceivable basis).  And, now, for the first time, the majority opinion exercises the "modern articulation" to invalidate longstanding legislation.

{89}     As best as I can discern, the difference between the traditional and the "modern" versions of rational basis review lies in what is required to demonstrate that a legislative classification is rationally related to a legitimate governmental purpose. *See Corn*, 1994-NMCA-161, ¶ 14.  Under traditional rational basis review, for a statute to serve a legitimate government purpose, the proponent of constitutionality "need only establish the *existence* of a *conceivable* rational basis" for the statute. *Kane*, 2015-NMSC-027, ¶ 17 (second emphasis added) (internal quotation marks and citation omitted); *see also State v. Cawley*, 1990-NMSC-088, ¶ 9, 110 N.M. 705, 799 P.2d 574 ("The party objecting to the legislative classification has the burden to demonstrate that the classification bears no rational relationship to a conceivable legislative purpose."); *accord Heller v. Doe*, 509 U.S. 312, 320 (1993) ("[A] classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (internal quotation marks and citations omitted)); *Sullivan v. Stroop*, 496 U.S. 478, 485 (1990) ("This sort of statutory distinction does not violate the Equal Protection Clause 'if any state of facts reasonably may be conceived to justify

it." (internal quotation marks and citation omitted)). Accordingly, "a legislative choice . . . may be based on rational speculation unsupported by evidence or empirical data." *Heller*, 509 U.S. at 320 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1970)); *see also Wagner*, 2005-NMSC-016, ¶ 39 (Bosson, C.J., concurring in part and dissenting in part).

{90} By contrast, the majority opinion states that a statutory classification must be supported either by a "firm legal rationale" or "evidence in the record." Maj. Op. ¶ 28. The majority opinion reasons that this standard separates New Mexico's form of rational basis review for state equal protection claims from rational basis review for federal constitutional claims. *See* Maj. Op. ¶¶ 25-27. But it is not clear why the equal protection guarantee of the New Mexico Constitution should grant this Court more discretion to invalidate socioeconomic legislation than the federal constitutional analogue. Under New Mexico's interstitial approach to determining state constitutional claims that have federal analogues (such as equal protection), this Court departs from the federal constitutional analysis *only* if the federal analysis is flawed or undeveloped or if there are characteristics distinctive to New Mexico that warrant a different constitutional analysis. *State v. Gomez*, 1997-NMSC-006, ¶ 20, 122 N.M. 1777, 932 P.2d 1. There is nothing distinctive or structurally different

78

about New Mexico such that our judiciary should have a greater power to invalidate socioeconomic legislation. And I do not agree with the implicit premise that the traditional form of rational basis review used by every federal and state court—including this Court when considering federal constitutional challenges—is flawed. *See, e.g.*, *Kane*, 2015-NMSC-027, ¶¶ 17-22 (applying traditional rational basis review). The majority opinion's analysis overlooks that when a court, in employing traditional rational basis review, perceives that governmental regulation harbors an *animus* toward a particular group, rational basis review suddenly has a "bite." Thus, rational basis review is a constitutionally discerning form of scrutiny, and not a flawed "rubber stamp." Therefore, our interstitial approach does not permit the majority opinion's departure from traditional rational basis review in this case.

{91} There are additional problems with the majority opinion's use of the "modern articulation" of rational basis review. To repeat Justice Bosson's observation in *Wagner*, the majority opinion does not explain what differentiates a "firm legal rationale" from any conceivable basis in the traditional form of rational basis review, as the bench and bar know it. The majority opinion even seemingly retreats from its own "evidence in the record" condition, as the majority opinion allows a justification for a statutory classification to be supported by outside-of-the-record, legislative facts

79

of which a court can take judicial notice. *See* Maj. Op. ¶ 28. So, we are left with "firm legal rationale" as the only condition in the heightened standard that separates the "modern articulation" of rational basis review from its traditional counterpart. And there is simply no indication of what would constitute a "firm legal rationale" or how a "firm legal rationale" differs from any conceivable basis justifying a legislative choice. By requiring a "firm legal rationale," the majority opinion overlooks that when the Legislature enacts socioeconomic legislation, the classifications and distinctions it creates may simply be the result of compromise and "are often impossible of explanation in strictly legal terms." *Romero*, 319 F. Supp. at 1203. Accordingly, under traditional rational basis review, any conceivable basis justifying a legislative classification simply *is* a firm legal rationale to uphold a statute against an equal protection challenge. *See, e.g.*, *Heller*, 509 U.S. at 320; *Beach Commc'ns*, 508 U.S. at 313.

{92} Further, the majority opinion's explanation of the "evidence in the record" condition is in tension with its requirement for a "firm legal rationale." By permitting a court to consider *sua sponte* legislative facts outside of the record, the so-called heightened standard suggests that a court may, in fact, attempt to conceive of any permissible legislative purpose that the statute under review rationally serves. Hence,

80

there is nothing to the "modern articulation" that should separate it from traditional rational basis review, and because Section 52-1-6(A) conceivably serves the legislative purpose of cost containment, it survives rational basis review.

{93}     Instead of explaining the "modern articulation," the majority opinion simply uses the words "firm legal rationale" as a license to determine that Section 52-1-6(A) is unconstitutional because it is "underinclusive" with respect to its putative purpose. Maj. Op. ¶¶ 29-35.  According to the majority opinion, because Section 52-1-6(A) allows for the exclusion of farm and ranch laborers (but not other farm and ranch employees) from workers' compensation coverage, it is underinclusive with respect to the permissible legislative purpose of cost containment.  *See* Maj. Op. ¶¶ 32-35. The majority opinion implies that if the Legislature *really* had wanted to control costs for New Mexico's farms and ranches, it would have allowed farms and ranches to exclude *all* of their employees, not just their farm and ranch laborers.  *See id.*  The irony, of course, is that this is exactly what the Legislature did.  But, again assuming the majority opinion's statutory interpretation *arguendo*, such underinclusiveness does not call into question the constitutionality of the statute.

{94}     It is the longstanding law of rational basis scrutiny—both in the federal and state constitutional context—that a legislative body, when enacting socioeconomic

81

legislation, can solve a problem piecemeal and that such underinclusiveness with respect to that purpose poses no constitutional flaw.[6] By contrast, when applying intermediate scrutiny and strict scrutiny, courts check to determine if a statutory classification is narrowly tailored to a legislative purpose—i.e., whether the statutory

---

[3]*See, e.g.*, *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 466 (1981) (rejecting an equal protection challenge because "a legislature need not 'strike at all evils at the same time or in the same way'" (quoting *Semler v. Or. State Bd. of Dental Exam'rs*, 294 U.S. 608, 610 (1935));*Vance v. Bradley*, 440 U.S. 93, 108 (1979) (rejecting an equal protection challenge because "[e]ven if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this 'perfection is by no means required'" (internal citation omitted)); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("Legislatures may implement their program step by step, in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." (internal citations omitted)); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 215 (1975) ("This Court frequently has upheld underinclusive classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it." (internal citations omitted)); *Williamson v. Lee Optical of Okl.*, 348 U.S. 483, 489 (1955) ("[T]he reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." (internal citations omitted)); *Ry. Express Agency v. New York*, 336 U.S. 106, 110 (1949) ("It is no requirement of equal protection that all evils of the same genus be eradicated or none at all."); *see also, e.g.*, *Torres v. Seaboard Foods, LLC*, 2016 OK 20, ¶ 32, as corrected (Mar. 4, 2016) ("A *mere* overinclusiveness or underinclusiveness in statutory classification will not necessarily show a failure to satisfy a rational-basis review."); *Lonaconing Trap Club, Inc. v. Md. Dep't of Env't*, 978 A.2d 702, 713 (Md. 2009) ("Underinclusiveness does not create an equal protection violation under the rational basis test.").

82

classification is under- or overinclusive with respect to its putative purpose. *See, e.g.*, *In re Vincent*, 2007-NMSC-056, ¶ 15, 143 N.M. 56, 172 P.3d 605 ("[F]or a challenged provision to be narrowly tailored to serve a compelling state interest under a strict scrutiny analysis, it must not be under-inclusive.").

{95} To be sure, a tailoring analysis can be useful to discern whether the Legislature created a discriminatory classification with animus toward a particular, discrete group and disguised that animus with a socioeconomic rationale. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 632 (1996) ("[The] sheer breadth [of Colorado's Amendment 2 prohibiting governmental action designed to protect gay and lesbian persons from discrimination] is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests."); *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 449-50 (1985) (holding that a city's requirement of a special use permit for the operation of a home for the mentally disabled was under-inclusive with respect to the city's putative purposes and, therefore, rested "on an irrational prejudice against the mentally [disabled]"). If a statutory classification is highly under- or overinclusive with respect to an ostensible legislative goal, then there exists good reason to believe that the legislative body had an ulterior,

impermissible motive. *See, e.g.*, *Romer*, 517 U.S. at 632; *City of Cleburne*, 473 U.S. at 449-50. Because rational basis review demands and searches for a permissible governmental purpose, it is not a rubber stamp for state action. But apart from determining a statute's legislative purpose (and thus whether that purpose is permissible), an inspection for underinclusiveness has no place in rational basis review. Otherwise, our doctrinal categories provide no guarantee of the separation of powers, and a court may apply a more stringent standard of review simply because it disagrees with the policy of the statute under review. *See, e.g.*, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 31 (1973) (finding that if the degree of judicial scrutiny of legislation fluctuated depending solely on a court's preference for a statute's purpose and effect, then the court would assume "a legislative role" for which it lacks "both authority and competence").

{96} The majority opinion's inspection for underinclusiveness does not even justify its holding. Here, the majority opinion's tailoring analysis simply does not result in a conclusion that the Legislature, since 1917, has acted with *animus* toward farm and ranch laborers. A statutory scheme that permits 29% of farms and ranches—most of which are large firms, likely employing hundreds of farm and ranch laborers—to voluntarily provide workers' compensation coverage to their employees is not a

statute that harbors an ulterior motive to discriminate against farm and ranch workers. Neither the statutory scheme nor the record indicates that for 99 years the Legislature has acted with an impermissible, discriminatory *animus* against farmworkers. Rather, the Legislature has rationally acted to contain costs for New Mexico's economically precarious farms and ranches so that they may continue to operate.

## III.  CONCLUSION

{97}  The law of statutory interpretation and the law governing judicial review of legislation safeguard the separation of powers.  This Court may not contort these areas of law to nullify validly-enacted legislation simply because we happen to believe that a statute is unfair or that its unfairness outweighs any other consideration that bears on the Legislature's decision.  While I understand the unfairness that may be perceived in the treatment of laborers who work for farms and ranches electing exemption from the WCA, I also understand the burden that may fall upon small New Mexico farms and ranches in having to incur regulatory costs more easily borne by their large competitors in the agricultural industry.  The Legislature enacted a statutory scheme that encompasses both employer and employee concerns and is eminently constitutional.  I respectfully dissent.

_____

**JUDITH K. NAKAMURA, Justice**

85